PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 95-3649

———————————

D.C. Docket No. 94-155-CR-ORL-19

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CANDACE L. COOPER,
GLENN H. MARTIN,

Defendants-Appellants

———————————

Appeal from the United States District Court
for the Middle District of Florida

———————————

**(January 13, 1998)**

Before COX and BARKETT, Circuit Judges, and HUNT\*, District Judge.

———————————

\*Honorable Willis B. Hunt, Jr., U.S. District Judge for the Northern District of Georgia, sitting by

designation.

HUNT, District Judge:

Glenn H. Martin and Candace L. Cooper appeal their convictions following a jury trial.[1] They raise challenges to the sufficiency of the evidence, the admission of certain evidence, the jury instructions, and the district court's application of the Sentencing Guidelines. Cooper also contends that her convictions are preempted by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015. For the reasons set forth below, we affirm.

## I. PROCEDURAL HISTORY

On November 10, 1994 a grand jury returned a thirty-three count indictment against defendants Martin and Cooper, charging them jointly with several crimes. Count One of the indictment charged defendants with conspiracy to commit mail fraud, and Counts Two through Eighteen charged defendants with the substantive acts of mail fraud that formed the basis of the conspiracy charge. Counts Nineteen through Thirty-three charged defendants with various forms of money laundering.[2]

---

[1] Martin was convicted of conspiracy to commit mail fraud, 18 U.S.C. § 371; mail fraud, 18 U.S.C. §§ 1341 and 2; and various forms of money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1957, and 2. Cooper was convicted of conspiracy to commit mail fraud and mail fraud.

[2] Specifically, the indictment charged defendants with engaging in monetary transactions affecting interstate commerce with criminally derived property (Counts Nineteen through Twenty-Five), money laundering with intent to promote the carrying on of specified unlawful activity (Counts Twenty-Six through Twenty-Eight), and money laundering with intent to conceal the proceeds of specified unlawful activity (Counts Twenty-Nine through Thirty-Three).

Following a two-month trial, a jury convicted Martin on Counts One, Three, Four, Nine, Fifteen, Sixteen, and Eighteen through Thirty-three and convicted Cooper on Counts One, Ten through Fourteen, and Seventeen. Shortly thereafter, the district court sentenced Martin and Cooper to prison terms of 140 months and seventy months, respectively, and further ordered each defendant to make restitution in the amount of $9,750,000 to the North Carolina Life & Health Insurance Guaranty Association. Defendants timely filed notices of appeal.

## II. FACTS

Martin's and Cooper's convictions arise out of their operation of Twentieth Century Life Insurance Company ("TCL"), an insurance company that did business in several states, including North Carolina and Florida. TCL was a wholly-owned subsidiary of a Florida holding company, Twentieth Century Financial Corporation of America ("TCFCA"). Martin was the chief executive officer ("CEO"), president, majority stockholder, and chairman of the board of directors of TCFCA, and Cooper, Martin's sister, was the corporate secretary of TCFCA, as well as a member of its board of directors. Martin was also the CEO, president, and chairman of the board of directors of TCL, and Cooper was TCL's executive vice president.

As an insurance company doing business in North Carolina and Florida, TCL was subject to regulation by the North Carolina Department of Insurance ("NCDOI") and the Florida Department of Insurance ("FLDOI"). Both of these agencies required that insurance companies maintain specific minimum ratios of assets to liabilities and surplus. If an insurance company

3

operated below these minimum ratios, NCDOI and FLDOI were authorized to bar the company from doing further business in their respective states because of statutory insolvency.

Because the valuation of assets had a critical bearing on the calculation of these ratios, NCDOI and FLDOI regulated the accounting treatment of assets by insurance companies. For example, neither of the agencies allowed insurance companies to treat loans or advances to "related" companies–companies with common ownership or management–as assets. Due to these and other regulations on the valuation of assets, it was possible for an insurance company to be declared statutorily insolvent and, therefore, subject to regulatory shutdown and takeover, despite the fact that, under generally accepted accounting principles, the company's assets exceeded its liabilities.

TCL sold various types of insurance policies, including single premium, whole life policies and single premium annuities. These policies would accumulate cash values that could be redeemed by the policyholder under certain conditions specified in the policy. These policies also required TCL to pay death benefits upon the death of the insured. TCL had the primary responsibility to make any payments to policyholders. However, under the laws of North Carolina and Florida, the North Carolina Life, Accident and Health Insurance Guaranty Association and the Florida Life and Health Insurance Association (the "Guaranty Associations")were required to reimburse all policyholders of life insurance companies located within their respective states that became insolvent or otherwise failed.

From 1984 through June 1989, Martin caused TCL to loan or advance substantial sums of money to other companies controlled by Martin. Although NCDOI initially was unaware that TCL was engaging in these related-party transactions, it increasingly became concerned about the

apparent illiquidity of TCL's assets as the percentage of TCL's assets in the form of business accounts receivable from a few companies continued to escalate. This concern led NCDOI to become more aggressive in its efforts to learn about TCL's assets, which, in turn, led to the discovery that TCL had engaged in extensive related-party transactions.

Although NCDOI could have shut down TCL for fiscal unsoundness once it discovered the related-party transactions, it instead entered into a consent agreement with TCL under which TCL would continue doing business subject to strict supervision by NCDOI. Among other restrictions, the consent agreement required TCL to receive NCDOI approval before making any disbursements from TCL bank accounts. Shortly after the execution of this June 8, 1994 consent agreement, FLDOI issued a series of consent orders relating to TCL's business in Florida. The orders severely limited the amount of new business TCL could write in Florida and required TCL to make a variety of disclosures to FLDOI concerning TCL's new business and its reserves.

The indictment charged Martin and Cooper with devising and executing a scheme to divert, conceal, and ultimately convert approximately $9,750,000 in funds received by TCL as premiums for certain annuities and single premium, whole life polices. According to the indictment, defendants issued policies in exchange for the converted premiums, but concealed the sale of the policies and TCL's receipt of the premiums from NCDOI and FLDOI by avoiding TCL's standard operating procedures for documenting the issuance of policies and the receipt of premiums. Instead of processing these policies and premiums in the usual fashion, Cooper maintained the records in a separate word processing file and handwritten log. The files regarding these policies were also

5

stored separately from TCL's other policy files, either in Cooper's office or in the trunk of Cooper's car.

Between July 1989 and August 1990, Martin, Cooper, and others deposited approximately $9,750,000 in premiums from these policies into bank accounts that had not been reported to NCDOI or FLDOI. These accounts were owned and controlled by Martin. The funds were ultimately disbursed by Martin for his personal use or were funneled to other corporations that he owned. Although Cooper did not receive any of these funds, she was aware that the premiums were being deposited in the unreported accounts and handled the premiums in a manner that prevented NCDOI and FLDOI from discovering the existence of the premiums.

In March 1991, NCDOI declared TCL statutorily insolvent and assumed the company's operation. However, the agency was unable to cure TCL's financial problems, and the company ultimately failed. As a result, the North Carolina Guaranty Association was statutorily obligated to assume the liabilities of all TCL policyholders up to $300,000 each.


### III. DISCUSSION

Martin and Cooper challenge their convictions and sentences on a number of grounds. Both argue that there was insufficient evidence to support their convictions, that the district court's instructions to the jury were fatally flawed, and that the district court erred by ordering each defendant to make restitution in the amount of $9,750,000. Martin further argues that the district court miscalculated his sentencing range under the Guidelines by improperly grouping the money laundering offenses and the amount of money laundered. Cooper also raises several challenges to

6

the district court's calculation of her offense level under the Guidelines and further challenges the district court's denial of her motion for a downward departure from the Guidelines. Cooper's primary argument, however, is that her convictions are barred by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015.

A. Preemption Under the McCarran-Ferguson Act

Section 2(b) of the McCarran-Ferguson Act provides, in relevant part, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Thus, the McCarran-Ferguson Act ensures the supremacy of the states in the realm of insurance regulation. Whereas a federal law ordinarily supersedes an inconsistent state law, "[t]he first clause of § 2(b) reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." United States Department of Treasury v. Fabe, 508 U.S. 491, 507,113 S. Ct. 2202, 2211, 124 L. Ed. 2d 449 (1993).

Although Cooper did not invoke the McCarran-Ferguson Act in front of the district court, she now argues that her "conviction should not stand because the mail fraud and conspiracy statutes have been preempted by the McCarran-Ferguson Act." Cooper's Brief at 12. This court, however, "sit[s] to review the proceedings in the district court rather than to serve as a *de novo* forum where prior proceedings can be retried." United States v. Johnson, 889 F.2d 1032, 1035 (11th Cir. 1989).

7

Accordingly, "[a]s a general rule, this court will not address an issue not decided by the district court." United States v. McAllister, 77 F.3d 387, 389 (11th Cir. 1996).

Although this rule is discretionary, we see no reason to depart from it in this case. Cooper had every reason and opportunity to raise this argument before the district court, and prohibiting her from raising it now will not result in a miscarriage of justice. Therefore, we decline to address the merits of Cooper's McCarran-Ferguson Act argument.[3]

B. Sufficiency of the Evidence

We next consider whether the government's evidence was sufficient to sustain defendants' convictions in this case. In reviewing the sufficiency of the evidence, we must consider the evidence in the light most favorable to the government and draw all inferences and credibility choices in favor of the jury's verdict. United States v. Adair, 951 F.2d 316, 318 (11th Cir. 1992). The convictions must be affirmed if any reasonable construction of the evidence would allow the jury to find defendants guilty beyond a reasonable doubt. United States v. McKinley, 995 F.2d 1020, 1025 (11th Cir. 1993). Based on our review of the record, we hold that there is sufficient evidence to support the jury's findings of guilt.

---

[3]Were we inclined to address the merits of this argument, we would review only for plain error because of Cooper's failure to raise it before the district court. *See* Fed. R. Crim. P. 52(b). Under this standard of review, the fact that the only three appellate decisions directly addressing this argument–United States v. Blumeyer, 114 F.3d 758 (8th Cir. 1997), United States v. Cavin, 39 F.3d 1299 (5th Cir. 1994), and United States v. Sylvanus, 192 F.2d 96 (7th Cir. 1951)–have held that the McCarran-Ferguson Act does not preempt federal prosecution for mail fraud would be particularly instructive.

1.  Cooper's Challenge

Cooper's argument that her mail fraud convictions cannot stand because the government failed to demonstrate that the mailings were made in furtherance of the alleged scheme requires little discussion. The counts of mail fraud of which Cooper was convicted involved the mailings of policy applications and premiums from an insurance agent to TCL during the time that Cooper was assisting Martin in converting the premiums. These mailings were at the heart of the scheme, as it was these premiums that Martin ultimately converted to his own use. Consequently, we have no difficulty concluding that a jury could have reasonably construed the evidence to support a finding that Cooper was guilty of mail fraud.

2. Martin's Challenge

Martin's argument concerning the sufficiency of the evidence is more properly characterized as an attack on the legal sufficiency of the indictment. Rather than arguing that the government failed to prove the acts alleged in the indictment, Martin contends that the acts alleged in the indictment do not constitute mail fraud. This argument is unavailing.

The mail fraud statute, 18 U.S.C. § 1341, criminalizes the use of the mails in furtherance of a scheme to defraud or to obtain money or property by means of false or fraudulent representations. Accordingly, in order to sustain a mail fraud conviction, the government must establish that the defendant intended to defraud a victim of money or property of some value. *See* Carpenter v. United States, 484 U.S. 19, 27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987). In this case, the indictment charged conjunctively that Martin devised a scheme to defraud the TCL policyholders, the state

9

guaranty associations, and TCFCA's minority shareholders by taking money and property. Although Martin argues that the scheme as alleged did not involve any legally cognizable monetary or property interest, we disagree. *See* United States v. Cosentino, 869 F.2d 301, 307 (7th Cir. 1989) (holding that alleged scheme to keep insurance company in business by deceiving regulators about company's financial status affected the property rights of the company's policyholders); United States v. Bailey, 859 F.2d 1265, 1276 (7th Cir. 1988) (holding that alleged scheme with potential to expose S&L's money and property to plunder by artificially keeping S&L in operation "could affect the property interests of the depositors, shareholders, and FSLIC, which would be potentially on the hook for some or all of the depositors' losses" and was, therefore, sufficient to support mail fraud conviction). We find the reasoning behind these decisions persuasive and hold that the allegations in the indictment and the evidence presented at trial were sufficient to support Martin's convictions for mail fraud and conspiracy.[4]

C. Remaining Issues

Defendants' remaining contentions may be disposed of summarily. With respect to Cooper's evidentiary challenges, we do not find that the district court abused its discretion in admitting evidence concerning the removal of the FSCA plaque and the cash surrender log. *See* R22: 213-217, 272-277; R9: 199-206. Furthermore, in light of this court's previous approval of the use of a jury

---

[4]Because we find that each of the government's theories contained in the indictment was legally sufficient to support a conviction of mail fraud, we summarily dismiss Martin's argument that the district court erred in giving a jury instruction that allowed the jury to convict on a legally inadequate basis.

instruction regarding willful blindness in a case involving a conspiracy charge, United States v. Peddle, 821 F.2d 1521 (11th Cir. 1987) (per curiam), we find that the district court did not err in giving such an instruction in this case. Finally, with respect to the sentencing issues raised by both defendants, the record clearly demonstrates that the district court properly calculated all aspects of defendants' sentences under the Guidelines after making the requisite factual findings and that these findings are not clearly erroneous. In addition, it is clear that the district court did not err in denying Cooper's motion for a downward departure.

## IV. CONCLUSION

For the reasons stated above, we affirm the convictions of Martin and Cooper.

AFFIRMED.