**UNITED STATES, Appellee,**

**v.**

**Charles S. CHRISTOPHER, a/k/a Chris Christopher, Defendant, Appellant.**

**No. 97–1111.**

United States Court of Appeals,
First Circuit.

Heard Sept. 8, 1997.

Decided April 27, 1998.

Terrance G. Reed with whom Christopher A. Hostage and Reed & Hostage P.C., were on brief, for Appellant.

Craig N. Moore, Assistant United States Attorney with whom Seymour Posner, Acting United States Attorney, Charles A. Tamuleviz, Assistant United States Attorney and Lisa Simotas, Attorney, Department of Justice, were on brief, for Appellee.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge.

Defendant-appellant Charles S. Christopher was convicted after a jury trial in the district court on eleven counts of wire fraud, 18 U.S.C. § 1343, and ten counts of interstate transportation of stolen goods, 18 U.S.C. § 2314. As vice president of Resolute Holding Company ("Resolute"), Christopher orchestrated Resolute's acquisition in 1988 of American Universal Insurance Holding Company ("American") and Diamond Benefits Life Insurance Company ("Diamond"). In acquiring these companies, Christopher used assets of the acquired insurance companies to, among other things, pay part of the agreed purchase price and to clear liens from property put up as collateral in the transaction. In so doing, Christopher violated promises to state insurance regulators that Resolute would not use the acquired companies' assets to pay for their purchase and that pre-existing liens on the collateral would be cleared by the closing. Both companies subsequently went into receivership.

The district court sentenced Christopher to 121 months' imprisonment and ordered restitution of $26.7 million. This appeal followed. Aside from a single error in the calculation of Christopher's restitution, we affirm.

## I. Background

Following the judgment of conviction, "we sketch the facts in the light most favorable to the jury verdict, consistent with record support." *United States v. Pitrone*, 115 F.3d 1, 3 (1st Cir.1997).

### A. *Resolute's Purchase of American and Diamond*

Pursuant to state laws designed to protect policy holders, Resolute had to seek the approval of insurance regulators in Arizona, California, and Rhode Island before acquiring American and Diamond. (American was a Rhode Island corporation, and Diamond was an Arizona corporation subject to jurisdiction of both Arizona and California.) In each application, known as a "Form A," Resolute proposed to infuse the target companies with much-needed capital. That capital was to come from business entities controlled by George W. Reeder, Resolute's majority owner, in the form of promissory notes. Three of the notes are relevant here. The first was payable to American for $50 million and was executed by Hilltop Developers ("Hilltop"). Hilltop's sole shareholder was Reeder. Two Hilltop properties known as "Heritage Ranch" and "Indian Palms" served as collateral for this note.

Hilltop and Reeder executed a second note in the amount of $12 million payable to Diamond. That note was secured by "Indian Springs," another property also owned by Hilltop and Reeder.

The third note, this one for $3 million, was also to be given for the acquisition of Diamond. This money came from Mydar Business Group, Inc. ("Mydar"). While all of Mydar's stock was nominally held by Tom Christopher, the defendant Christopher's brother, the defendant himself held a fifty percent "silent" interest in Mydar. The Mydar note was secured by "Big Springs," a property surrounding defendant Christopher's personal residence.

Diamond was to receive further capital from a cash-for-annuities exchange with the Life Assurance Company of Pennsylvania ("LACOP"). Arranged by Christopher and Resolute, this transaction gave Diamond $29.4 million ($18 million at closing) from LACOP in return for Diamond's assumption of $31 million in LACOP's annuity obligations.

### B. *Regulatory Approval of the Acquisitions*

At the time of the applications, each of the four properties securing the described promissory notes (Heritage Ranch, Indian Palms, Indian Springs, and Big Springs) were encumbered by prior liens. Because of these encumbrances and other concerns, insurance regulators in each state were reluctant to approve the purchase.

Faced with regulatory disapproval, Resolute and Christopher provided a number of assurances to the regulators causing them to acquiesce. Christopher and Resolute assured Arizona that all encumbrances on the collateral would be removed by the time of the closing. Resolute's Arizona Form A represented that "it is expected" that at the closing of the purchase of Diamond the liens on the collateral "will be paid in full."

Similarly, Christopher assured Rhode Island insurance regulators through Resolute's attorneys just ten days before the American transaction closed that the collateral "will be free and clear of all liens at the time the property is transferred to [American]." Christopher's attorney testified that every document representing that Resolute would pay off the liens before closing was prepared with information Christopher provided. Rhode Island issued a Conditional Order on May 27, 1988, approving Resolute's purchase of American. That order provided that, although the transaction closed that day, the change of ownership would not be official until Resolute submitted final title insurance policies for Heritage Ranch and Indian Palms "to be effective as of the closing date which indicate[ ] . . . that all . . . mortgages, deeds of trust, and the like have been paid in full and discharged."

On June 7, 1988, California approved the Diamond acquisition subject to Resolute's written commitments that (1) "no part of the purchase price for Diamond Benefits would be obtained from its assets," (2) Resolute would raise Diamond's capital and surplus to $3 million, and (3) for purposes of determin-

ing that capital, the $12 million and $3 million notes would be given no value.

## C. Christopher Clears the Collateral Properties' Pre Existing Liens

When the acquisition of American closed on May 27, 1988, the pre-existing liens on the four collateral properties were still outstanding. Likewise, when the Diamond acquisition closed on June 14, 1988, the liens on that collateral were still outstanding. So much was undisputed at trial.

On July 25, 1988, well after both the Diamond and American acquisitions closed, Christopher and Resolute attorney Jarrell Ormand sent over $3.3 million "from," as Christopher himself put it, "Resolute, [American], and/or Diamond" to First American Title. As Resolute was a holding company with virtually no cash, the bulk of the $3.3 million came from the acquired insurance companies. Christopher's letter directed First American Title to use the money first to satisfy the pre-existing liens and, second, to issue title insurance policies to Diamond and American pertaining to the collateral properties.

Christopher instructed First American Title parenthetically that these policies were to be back-dated to the closing date. Thus, in one instance, Christopher wrote the title insurer that American was to "receive ... a CTLA Mortgagee's Title Insurance Policy (dated as of May 27, 1988) in connection with [the collateral properties]." That letter contained no explanation for the back-dating request.

Four days later, Ormand, Resolute's attorney, also wrote First American Title at Christopher's direction to request that the policies be dated back to the date of closing. He stated simply that for Indian Springs (collateral for Diamond), the "policy ... should be dated as of June 14, 1988," and that for Indian Palms (collateral for Diamond and American), "[i]t should be dated as of May 27, 1988." Christopher then sent Rhode Island regulators what he described as "[o]riginal copies of title insurance policies dated as of May 27, 1988." Ormand also testified that Christopher told him that "we're going to take $18 million out of Diamond Benefits and pay down the liens on [the collateral properties]."

First American Title forwarded Christopher title policies dated, per his requests, to match the closing dates. First American Title's chief title officer testified at trial that his company back-dated the policies at "the request of the insured and we were willing to be accommodating in this instance." He testified he was unaware of Christopher's purpose in requesting the earlier date.

First American Title's representative also testified that in back-dating the policy, the company was not protecting American and Diamond against any additional risk or providing them with any additional assurances. He believed that First American Title actually reduced its risk by dating the titles as of the closing since the terms of the policy guaranteed the title only as of the period beginning with the execution of the promissory notes and ending with the date on the policies. In any case, while the back-dating might suggest that the insurance companies had obtained a first position on the collateral by the actual date of the closing, that was not the case, as Christopher knew.

## D. Financing the Acquisitions: The Insurance Companies "Loans" and the Purchase of Desert Aire

Notwithstanding Christopher's representations to regulators that the collateral liens would be paid off by time of the closing, and that assets of the acquired companies would not be used for the purchase, Christopher caused actions to be taken that, the jury could find, violated both representations. After the closing, the insurance companies "loaned" cash to Hilltop and Mydar, the owners of the collateral, which they used to remove the liens on the collateral. Cash belonging to Diamond was also used to pay Diamond's purchaser. Hilltop and Mydar noted on their books the crediting of "intercorporate credits" in favor of Diamond and American. In due course, both insurance companies went into receivership and became unable, by themselves, to meet their liabilities to policyholders. These transactions are described in greater detail below.

### 1. *The Hilltop/Windbrook Note*

At Christopher's direction, Diamond loaned $18 million to Hilltop. The loan was secured by Windbrook Country Club, itself then worth $5 million. Christopher arranged for Diamond to obtain this cash by opening a bank account in its name and then having LACOP transfer the purchase money for Diamond's newly acquired annuity obligations into that account. That transfer formed the basis for Count 1 of the indictment.

Christopher directed the distribution of several million dollars before regulators called a halt to the scheme. Two transfers of about $1.9 million each went to pay off Diamond's former owner in satisfaction of a large portion of the agreed purchase price of Diamond (Counts 2, 3 (wire fraud), 12, and 13 (interstate transportation of stolen goods)). According to the prosecution, this flagrantly violated California's prohibition against using Diamond's own assets to pay the purchase price. The next transfer (Counts 4 and 14) of about $440,000 paid off Christopher's personal note on the Big Springs property. Christopher then wired $8.7 million (Counts 6 and 15) to clear the liens on Heritage Ranch, the property securing the $50 million note contributed to American. Three more wires sent $465,000 to Hilltop (Counts 7 and 16), $825,000 to a trust account for Reeder himself (Counts 8 and 17), and $459,000 to Hilltop and a Reeder account (Counts 9 and 18). $5.9 million was used to pay off the liens on Indian Palms, one of two properties securing the note for American(Counts 10 and 19); this amount exhausted the LACOP funds, so Christopher ordered the transfer of $3 million from American to the new Diamond account.

### 2. *The Mydar Note*

At Christopher's direction, American loaned $5.4 million to Mydar. Mydar's note was secured by Big Springs, a property worth no more· than $330,990. Since Big Springs was already securing the $3 million promissory note from Mydar to Diamond, Christopher simply canceled that note.

Christopher then distributed the proceeds of the $5.4 million "loaned" by American to Mydar as follows: $3.1 million was disbursed to Resolute, which immediately returned it to American. Similarly, $1.46 million was given to Resolute, which then gave it right back to Diamond. Diamond received $440,000 directly, replacing the money Christopher had used to pay off his mortgage. $138,000 (Counts 5 and 20) was used to clear additional liens on Big Springs.

### 3. *Desert Aire*

Christopher arranged for American to pay $15.1 million. for Desert Aire, a property in California with an appraised value of $7.5 million (and title insurance in that amount) and time share notes worth $7.5 million, generating income monthly. However, Christopher's attorney testified at trial that the actual purchase price was initially only $11.75 million and that at Christopher's direction he falsely inflated the purchase price in a letter documenting the transaction. The remaining $3.3 million of the proceeds generated by this falsification went to pay off the liens for Heritage Ranch and Indian Springs (Counts 11 and 21).

In the summer of 1988, just months after the Resolute acquisitions, an audit of Diamond revealed the disbursement of the LACOP funds. In September, 1988, Resolute terminated Christopher's duties. Diamond went into receivership later in 1988. American spent two weeks in receivership during the fall of 1988, and became irretrievably insolvent by 1991.

## II. Discussion

### A. *Sufficiency of the Evidence*

On appeal, Christopher contends that there was insufficient evidence to convict him of wire fraud. He attacks each of the three categories of the wire transfers: (1) those used to pay off pre-existing liens on the collateral properties, (2) those that paid for Diamond's purchase price, and (3) those that relate to the wiring of cash to LACOP in exchange for the assumption of LACOP's annuities. Essentially, Christopher argues that his scheme did not violate any promises made to the regulators. We disagree.

### 1. Satisfaction of Pre-Existing Liens

■ Christopher concedes that, with the exception of the wire transfers for Diamond's purchase price (Counts 2, 3, 12, and 13), the wire transfers paid off pre-existing liens that encumbered the properties pledged as collateral. He disputes that any regulator forbade the payments. He points to a change Rhode Island regulators made from a draft of their conditional order: the initial version required the liens to be cleared "at the time of closing," while the conditional order that actually issued stated that the liens were to be cleared "effective as of the closing date." As for California and Arizona, he denies that any regulator required the satisfaction of pre-existing liens.

Respecting the Rhode Island conditional order, there was ample evidence that Christopher, in the course of correspondence and dealings with regulators, represented that he would see that the liens were cleared before the closing. In light of this evidence, the jury could have found that the conditional order itself could not reasonably be understood to sanction continuance of the liens for two months after the closing occurred.[1] Hence the language requiring an indication that "as of the closing date ... all mortgages, deeds of trust and the like have been paid in full and discharged" meant that the encumbrances would be discharged as of the closing date, not of some later date. The lead Rhode Island regulator testified to understanding that the "effective as of" closing language meant that the properties would in fact be lien-free on the date of the closing; the contested language simply allowed Resolute to close the transaction immediately and to send later its documentation that the insurance companies held a first security interest as of the closing. She testified that documentation "had to reflect the conditions as of the date of the closing." The "effective as of" language permitted only later documentation, not a later clearing of the liens.

Such an understanding would accord with the regulators' statutorily-mandated goal of ensuring that the insurance companies were adequately capitalized. *See infra.* All concerned knew that the targeted insurance companies were in need of immediate capital, and it was in this context that Christopher had promised that Resolute—virtually a shell corporation—would see that both companies' surpluses were increased. Without reliable collateral, the promissory notes could not be counted on for this purpose. To allow the liens to remain after closing would leave the companies' capital deficiency, at the very least, unresolved, and opened up the possibility—which in fact occurred—that the liens would be extinguished by use of the acquired companies' already depleted funds. Either option was plainly untenable in light of the regulators' concerns, of which Christopher was well aware. The jury could conclude that Christopher realized that his scheme exceeded the scope of Rhode Island's conditional order, and, indeed, was an obvious subterfuge designed to evade it.

As for California and Arizona, Resolute's attorneys, acting at Christopher's direction, promised that the collateral pledged to Diamond would be lien-free by closing. Christopher relies on the fact that the Arizona and California approval orders contained no express requirement that the liens be cleared prior to closing. The jury could conclude, however, from the communications between Christopher, his attorneys and the regulators that Christopher made representations to this effect which he realized were essential to securing their approvals.

### 2. Wires Transmitted for the Purchase of Diamond

■ Christopher promised that Resolute would not use Diamond's assets to help pay its purchase price. He now argues that he did not use Diamond assets to purchase Diamond, but simply advanced Diamond's assets to Resolute—in the form of "loans"—in ex-

---

1. The relevant portion of the Conditional Order of May 27, 1988, provided that

    This Order will become final upon receipt, review, and written approval of the following documents:

    \*     \*     \*

2. Final title insurance policies issued by First American Title Insurance Company to be effective as of the closing date which indicates [sic] that ... all mortgages, deeds of trust and the like have been paid in full and discharged.

change for offsetting credits and a note. Since the government adduced no evidence that Diamond did not in fact receive such a credit, he contends, the convictions based on that purchase must be vacated.

■ Here, Christopher is simply splitting hairs. The funds that paid for the purchase of Diamond came out of Diamond's LACOP money and contradicted California's express order that no part of the purchase price for Diamond could come from Diamond's assets. To call them "loans" makes no difference. The later "credits" did not legitimate the transaction, but, the jury reasonably could have found, were merely part of a shell game Christopher devised to hide the nature of the transfers. *See United States v. Jimenez–Perez*, 869 F.2d 9, 10 (1st Cir.1989) ("[The jury] could legitimately have presumed that the fabrication[s] w[ere] all the more proof of [defendant's] guilt.").[2]

### 3. *Wire Transfer of LACOP Proceeds to Diamond*

■ Count 1 of the indictment was based on Christopher's deposit in a special account, kept secret from Diamond's directors, of the cash Diamond received in exchange for assuming the LACOP annuities. Christopher argues that this transfer could not be fraudulent because LACOP and Diamond had entered into a contract to transfer the annuities for cash.

The transfer and misuse of the LACOP money was an indispensable part of Christopher's fraudulent scheme. He could not have obtained that money without having made misrepresentations to state regulators that induced them to approve Resolute's acquisition of Diamond, including promises that

none of Diamond's assets would be used to pay its purchase price and that the LACOP funds would be invested in government bonds and other liquid investments. The fraudulent nature of the transfer was highlighted by Christopher's opening of an account for Diamond in which he deposited the $18 million and which he kept secret from Diamond's officers, and from which he improperly distributed the funds. We find ample evidence of Christopher's fraudulent intent with respect to the funds transferred from LACOP.

### B. *Deprivation of "Property"*

Christopher challenges the validity of his conviction in light of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Supreme Court reversed a fraud conviction based on a deprivation of state citizens' right to honest government services and held that " § 1341[is] limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2882.[3]

According to Christopher, his conviction exceeds the *McNally* limitation. First, he reasons that he did not deprive any state of "property," as the states' regulatory interest in his acquisitions amounted to nothing more than the public's right to honest government services—precisely the result forbidden in *McNally*. Second, Christopher contends that the deception of the state insurance regulators, resulting in increased risk and actual losses of policyholders was at most a form of indirect victimization not prohibited by the wire fraud statute. Christopher says the wire fraud statute requires "convergence"—that is, the scheme must deceive the

**2.** Christopher claims that the court erred in imposing a one-level upward departure to his sentence based on his violations of regulatory orders including the Rhode Island conditional order. *See* USSG § 2F1.1(b)(3)(B) (allowing sentencing court to depart upward based on "violation of any judicial or administrative order"). We think there is adequate evidence that regulatory orders as well as less formalized promises were violated. Christopher's argument that this guideline applies only to recidivists is unfounded. *See United States v. Shadduck*, 112 F.3d 523, 530 (1st Cir.1997) (reading guideline as permitting departure for any violation of order or decree imposed

pursuant to "formal proceedings"); *United States v. Newman*, 49 F.3d 1, 9–10 (1st Cir.1995) (affirming enhancement based on defendant's violation of consent decree entered into with insurance regulators).

**3.** In the wake of *McNally*, Congress enacted 18 U.S.C. § 1346, which provides that the deprivation of "the intangible right of honest services" may constitute a scheme to defraud. However, as the government and Christopher agree, § 1346 is inapplicable here because its enactment occurred after the wire transfers at issue.

same person whom it deprives of money of property. This is an issue that has generated a split of authority. *Compare United States v. Blumeyer,* 114 F.3d 758, 767–68 (8th Cir.)(expressly rejecting convergence doctrine), *cert. denied,* —— U.S. ——, 118 S.Ct. 350, 139 L.Ed.2d 272 (1997), *with United States v. Lew,* 875 F.2d 219, 221–22 (9th Cir.1989). We deal with these arguments in reverse order, turning first to "convergence" and then the question whether "property" is involved.

### 1. *Convergence*

■ We reject Christopher's argument that this court has already adopted the convergence theory. Christopher relies for this proposition on *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786 (1st Cir.1990), and *United States v. Sawyer,* 85 F.3d 713 (1st Cir.1996). Neither case mentions the term "convergence."

In *McEvoy Travel,* a travel agency brought a civil RICO action, *see* 18 U.S.C. § 1964(c), against a competitor who had won an exclusive contract with a former client of the plaintiff. The complaint alleged predicate mail and wire fraud violations based on the competitor's fraudulent statements to industry regulatory agencies in order to cause them to approve the exclusive contract. *See McEvoy Travel,* 904 F.2d at 788–89. The district court dismissed for failure to state a claim, and we affirmed. Christopher points to our statement that "[w]hile deceiving [the regulators] may have been part of a larger plan having an adverse impact on [plaintiff] McEvoy, this fact did not make McEvoy the object of a mail or wire fraud." *Id.* at 794.

This statement in *McEvoy Travel* was directed not to the scheme-to-defraud element, but rather to the sufficiency of causation. *See id.* at 793 ("There was ... no causal connection, in the ordinary sense, between the fraudulent submission to the [regulatory agencies] and McEvoy's injury. The latter was caused by [the client] Norton's withhold-ing of its business from McEvoy, not some trick or artifice."). In the scheme urged by the *McEvoy Travel* plaintiff, the deception actually *followed* the loss. *See id.* When we reasoned that no mail or wire fraud had occurred because "the only parties deceived—[the regulators]—were not deprived of money or property," *id.,* we were simply making the point that the deception must in fact cause the loss.

Christopher also seizes on a footnote from our opinion in *United States v. Sawyer,* 85 F.3d 713 (1st Cir.1996), a prosecution for a scheme to deprive another of the right to honest government services under the revised § 1346. Sawyer was a lobbyist who, in violation of a state statute, gave gifts to state legislators. This court vacated Sawyer's mail fraud convictions based on defective jury instructions. We then rejected the prosecution's alternative theory that Sawyer's deception of his employer (he had hidden the gratuities) was a prohibited scheme to defraud. The footnote relied on by Christopher stated in relevant part:

> Sawyer's deceptive conduct toward [his employer], alone, cannot form the basis of this honest services fraud conviction. Rather, the alleged victims of the mail fraud—here, the state and the public— must be the ones deceived. Thus in order for any deception of [the employer] to form a part of the scheme to deprive the Commonwealth and her citizens of legislators' honest services, *some showing that such conduct was connected to the defrauding of alleged victims is required.*

*Sawyer,* 85 F.3d at 734 n. 18 (citations omitted and emphasis added). As in *McEvoy Travel,* the *Sawyer* panel simply rejected a fraud claim based on misrepresentations that did not cause relevant harm; neither decision required a convergence theory.[4] We, therefore, reject Christopher's claim that this court has previously adopted the convergence view of the mail and wire fraud statutes.

---

4. We recognize that in the same footnote the *Sawyer* panel shorthanded *McEvoy Travel* as "rejecting the position that a scheme to defraud is established if the deception of one party causes deprivation to another." *Sawyer,* 85 F.3d at 734

n. 18. Read in context, we doubt that the *Sawyer* panel meant that *McEvoy Travel* had announced a convergence theory, and are certainly not bound by another panel's passing characterization of an earlier circuit holding.

Turning to whether we should now adopt a convergence theory, we see little reason to do so. Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived. The phrase "scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, is broad enough to include a wide variety of deceptions intended to deprive another of money or property. *McNally* itself says nothing about convergence. *See United States v. Evans*, 844 F.2d 36, 39 (2d Cir. 1988). We see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud. If, for example, the role of a government regulator is to protect the monetary interests of others, a scheme to mislead the regulator in order to get at the protected funds will affect "property rights" as required in *McNally*.

### 2. *Protection of Property Rights*

■ The deception in the present case did not simply relate to depriving the citizens of California, Arizona and Rhode Island of the honest services of government officials in some abstract sense. The three states' insurance codes each provided that its regulators may disapprove an acquisition of an insurance company when "[t]he financial condition of an acquiring person is such as might jeopardize the financial stability or prejudice the interests of its policyholders." Cal. Ins. Code § 1215.2(d)(3) (West 1998); *see also* Ariz.Rev.Stat. Ann. § 20–481.07(A)(6) (West 1997) (same); R.I. Gen Laws § 27–35–2(d)(1)(iii) (1997) (same). Christopher was accused of intentionally subverting requirements imposed by state insurance regulators designed to protect the financial health of two insurance companies during their purchase by Resolute, Christopher and his associates. By his deceptive representations and by making a deliberate end run around those requirements, Christopher siphoned over $26 million from the coffers of the two companies, diverting to his own purposes funds the regulators sought to protect. Thereafter, both companies became insolvent, threatening or causing actual monetary loss to policyholders and to special funds established under state law to protect policyholders in the event of a company's insolvency. The purpose and result of the fraud plainly related to money. While the true victims were not merely the deceived regulators, the causal connection between the deception and the loss of property is obvious. *See McEvoy Travel* 904 F.2d at 793.[5]

The prosecution's theory of the case was as just stated. The indictment charged that false statements to the insurance regulators first enabled Christopher and his associates to arrange for the siphoning of Diamond's and American's assets, and that they then further concealed the wrongdoing. Both American and Diamond went into receivership. Given that Christopher arranged for each company to get far less than he promised from the acquisition, the jury could reasonably have concluded that the scheme was designed to deprive and did in fact deprive the insurance companies of property, placing the policyholders in ultimate jeopardy. In instructing the jury, the district court first reiterated the scheme as charged in the indictment, then explained that a "scheme or artifice to defraud is an intentional course of conduct which is done for the purpose of depriving a person or corporation of some possession, right, or interest by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." Based on the indictment and instructions, the jury could not have convicted Christopher had it not found that his fraudulent representations were a means to take money from American and Diamond and to use those

---

5. We note that several other courts have upheld wire fraud convictions based on very similar facts. *See United States v. Cooper*, 132 F.3d 1400, 1404 (11th Cir.1998) (upholding conviction based on deception of insurance regulators that harmed policyholders); *Blumeyer*, 114 F.3d at 767–68 (affirming conviction based on misrepresentations made to insurance regulators that allowed victimization of others); *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir.1989) ("[I]n misleading the Department of Insurance, the scheme permitted the agency to remain in business past the point it would have had the Department been aware of the defendants' activities—and that additional time allowed the defendants more time to take [the victims'] money.").

funds for improper purposes concealed from the regulators. Such a finding places Christopher's conduct well within the reach of § 1341.

### C. Denial of Jury Instruction Regarding Advice of Counsel

■ Christopher requested that the court instruct the jury that good-faith reliance on the advice of counsel is a defense to wire fraud. The district court denied this request on the ground that Christopher had not apprised counsel of his plans to use the insurance companies' funds to satisfy pre-existing liens. In particular, the district court pointed to the fact that Christopher ordered Fleet Bank to disburse the LACOP annuity funds without relying on counsel.

Christopher responds that there was a sufficient predicate in the evidence to require the giving of this instruction. He points to the fact that numerous lawyers were involved at every step of the acquisitions, including the restructuring of the Windbrook and Mydar loans. In letters to both his own attorneys and to Resolute's, Christopher claims to have fully disclosed his intention to use the insurance companies' assets to pay off the pre-existing liens, and to inflate the purchase price of Desert Aire.

We doubt that Christopher made a sufficient showing of good faith reliance on counsel to justify a finding in his favor on that basis. But we need not decide the issue since we have held that "[a] separate instruction on good faith is not required in this circuit where the court adequately instructs on intent to defraud." *United States v. Camuti*, 78 F.3d 738, 744 (1st Cir.1996). The district court told the jury here that conviction required a finding that Christopher "knowingly" participated in a scheme to defraud, and defined "knowingly" to mean an act done "voluntarily and intentionally and not because of mistake or accident or other innocent reason." Moreover, the court instructed the jury that Christopher was guilty only if he "knew he was violating the law." Similar instructions were given on the counts for interstate transportation of stolen goods. Because the district court's instructions "sufficiently convey[ed] the defendant's theory,"

*United States v. DeStefano*, 59 F.3d 1, 2–3 (1st Cir.1995) (citation omitted), the refusal to give a reliance-of-counsel instruction was not error.

### D. Requested Jury Instruction on Limited Use of Evidence of Administrative Violations

■ Christopher requested an instruction that would have told the jury that (1) a violation of an administrative order did not compel the conclusion that defendant had committed the charged offense and (2) any evidence of such a violation goes only to the defendant's intent to commit the crime. The court gave the first half of this instruction, charging the jury that "violation of an insurance regulatory order is not itself a crime," but not the second part, instead telling the jury that it "may consider all evidence or lack of evidence of such a violation in determining whether the Defendant committed the offenses charged in the indictment." This instruction, Christopher argues, permitted the jury to apply the evidence of the regulatory violations directly to the actus reus of the offense.

Taking the instructions as a whole, as they must be taken, *see United States v. Arcadipane*, 41 F.3d 1, 8 (1st Cir.1994), they did not encourage the jury simply to equate a violation of the regulatory orders with the commission of wire fraud. That much was evident based on the instruction that "[t]he violation of an insurance regulatory order is not itself a crime." Wire fraud was described as the "transmission of a wire communication in interstate commerce in furtherance of a scheme to defraud." A rational jury could scarcely have applied the evidence of regulatory violations to elements other than whether Christopher knowingly participated in a scheme to defraud and whether he did so with a specific intent to defraud.

### E. Sentencing and Restitution

Using the 1988 Sentencing Guidelines, the district court sentenced Christopher to 121 months' imprisonment and ordered him to pay restitution of $26.7 million. The district court increased the base offense level of six, *see* U.S.S.G. § 2F1.1 (1988), on several

**56**

grounds: eleven levels because Christopher caused a loss of over $5 million; five additional levels for the total loss of $26.7 million; two levels for Christopher's causing Diamond to become insolvent; one level for a violation of regulatory orders; and one level for causing a lack of investor confidence in Diamond and American.

Christopher attacks his sentencing on several fronts. We consider each in turn.

### 1. Calculation of Loss

■ The district court calculated a total loss of $26.7 million by totaling up the monies Christopher siphoned from Diamond and American in payment of the companies' purchase price and to clear liens on collateral for the notes. These consisted of the so-called Windbrook/Hilltop "loan" proceeds ($18 million), the Mydar "loan" ($5.4 million) and the overpayment for Desert Aire ($3.3 million).

Christopher argues that the trial court erred in failing to undertake any actual loss computation, in light of evidence showing offsetting economic value to Diamond and American, especially the remaining value of the collateral. Under the "economic reality approach" adopted by other courts, see United States v. Kopp, 951 F.2d 521, 531 (3d Cir.1991), Christopher contends, the loss calculation must be based on the net economic loss caused or intended by the defendant. He also places some weight on Application Note 7(b) to § 2F1.1 (providing that "[i]n fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim").

The short answer to this argument is that these sums that Christopher caused to be siphoned from American and Diamond were actual "net" losses, not merely gross losses. Had the deal proceeded as the regulators anticipated, and as Christopher represented, these large amounts of cash would not have been diverted from the two companies while, at the same time, the Reeder and Mydar notes to the companies would have been secured by encumbrance-free collateral, the encumbrances having been cleared by outside

funds prior to the closings. Christopher and Resolute promised to deliver to the companies the capital embodied in the promissory notes, backed by lien-free collateral. While the companies eventually gained the senior security interest in the collateral, they did so only after paying from their own depleted funds the $26.7 million which, were it not for Christopher's fraud, they would have kept. To reduce the loss by the value of the foreclosed collateral, as Christopher urges, would double count: the insurance companies were entitled to the protection of lien-free collateral without having to reduce their own capital in order to pay off the liens. The actual loss was, therefore, the $26.7 million taken from the companies.

Christopher argues that the district court erred in blaming him for the full $26.7 million loss and in not taking into account other causes of the financial harm to American and Diamond.[6] The loss figures in the Guidelines are based on the assumption that "the defendant alone is responsible for the entire amount of the victim loss." United States v. Gregorio, 956 F.2d 341, 347 (1st Cir.1992). Christopher points to evidence presented at trial of two other causes for Diamond's and American's losses: (1) their poor insurance practices before and after his short tenure, and (2) the role of Wayne Reeder, Resolute's majority owner, who owned the properties that served as collateral for the acquisitions (and which were encumbered by liens of over $21 million), as compared with the $548,000 of lien obligations on Mydar-related (and Christopher-owned) properties.

The district court's decision not to reduce the loss amount in light of these other factors was not an abuse of discretion. That Christopher diverted $26.7 million from the two insurance companies was not attributable to the companies' insurance practices. And Reeder's pre-existing liens were not an independent cause of the losses. At most they were an incentive for the theft. Christopher himself took the lead in moving the scheme along every step toward completion. Be-

---

6. We note that Christopher is not arguing that others' responsibility for the entire amount of victim loss required the district court to depart

downward. See United States v. Shattuck, 961 F.2d 1012, 1016–17 (1st Cir.1992).

cause the losses would not have occurred without Christopher's actions, the court was not required to consider other causes in calculating the loss.

### 2. *Calculation of Restitution*

■ Under the version of the statute applicable to Christopher's case, "the court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation." 18 U.S.C. § 3663(e)(1) (1988) (repealed 1996). Christopher points out several aspects of his scheme that resulted in the insurance companies' receiving some remuneration. One error below is stipulated: the government agrees with Christopher that restitution of the entire $5.4 million of the Mydar loan is inappropriate because the only counts in the indictment relating to that loan (Counts 5 (wire fraud) and 20 (interstate transportation of stolen property)) involved a wire transfer of only $138,000. Thus, restitution should have been at most $21,438,000 rather than $26,600,000 as ordered below. Although Christopher failed to make this argument below, the government concedes that it is plain error to impose restitution based on losses for which the defendant was not charged in the indictment. *See United States v. Gilberg*, 75 F.3d 15, 20–22 (1st Cir.1996).

Otherwise, the calculation of restitution was correct. Christopher claims that the district court should have reduced the total by the amount of income that American has received from Desert Aire, or ignored the Desert Aire purchase altogether since the value of the property and time share notes equals the amount American actually paid. This, however, ignores the simple fact that American was $3.3 million the worse for his inflation of the Desert Aire purchase price. Had he been honest, American would have received an identical return from the property and given up $3.3 million less in the process.

Similarly, Christopher points to the fact that, as part of a post-receivership settlement with American, Diamond was scheduled to receive title to the Heritage Ranch collateral. Again, Christopher attempts to get extra credit for providing Diamond with what rightfully belonged to it. *See* § E.1, *supra.* For the reasons already described, we reject Christopher's claim.

### 3. *Upward Departure Based on Christopher's Causing the Insurance Companies To Become Insolvent*

■ Finally, Christopher attacks as clearly erroneous the district court's finding that Christopher caused Diamond's insolvency. Christopher notes that, prior to its acquisition by Resolute, Diamond had a negative net worth. Moreover, in its "version of the offense" included in the PSI, the government conceded that without additional capital, Diamond would be insolvent. Absent the monies provided by the Hilltop and Mydar loans, Christopher argues, Diamond would have continued to be insolvent.

However, Diamond's receiver testified at sentencing that the loss of the $18 million left Diamond insolvent. Although the receiver also testified that Diamond was "struggling" with its cash flow during the summer of 1988, it remained, in his view, "viable" until it was deprived of the $18 million. The fact that Diamond would have been insolvent without an infusion of cash is precisely the point: the regulators would never have approved the acquisition were it not for Resolute's promises to put money into the company. Instead, Christopher caused Diamond to assume $30 million in new annuity obligations from LACOP and took the purchase price to pay for obligations that he had caused Diamond to assume. Christopher's position ignores what a responsible officer would have done with the LACOP annuity funds: use them to improve Diamond's already precarious financial position. Instead, Christopher used the money to secure Resolute's control of Diamond, at a large net loss to Diamond. The $18 million was greater than the $15 million California regulators thought necessary to revitalize the company, so Christopher's dissipation of those funds can reasonably be viewed as a but-for cause of Diamond's insolvency. Thus, the district court made a choice among supportable alternatives, and that choice was not clearly erroneous.

58

### III. Conclusion

We *modify* the restitution order consistent with this opinion. Subject to that modification, the convictions and sentences are otherwise affirmed.