<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-1831

                         UNITED STATES,

                           Appellee,

                               v.

            GEORGE WAYNE REEDER, A/K/A WAYNE REEDER,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF RHODE ISLAND

      [Hon. Francis J. Boyle, Senior U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

            Aldrich and Cyr, Senior Circuit Judges.

                     _____________________

   Dennis P. Riordan, with whom Dylan L. Schaffer, Riordan &
Rosenthal, Law Offices of e.robert (bob) wallach, P.C. and
e. robert (bob) wallach, P.C. were on brief, for appellant.
   Sangita K. Rao, Attorney, Department of Justice, with whom
Margaret E. Curran, United States Attorney, and Craig N. Moore,
Assistant United States Attorney, were on brief, for appellee.

                      ____________________

                        March 10, 1999
                      ____________________

         TORRUELLA, Chief Judge.  Appellant, George Wayne Reeder,
was charged with five counts of wire fraud, in violation of 18
U.S.C.  1343, and five counts of interstate transportation of
stolen property, in violation of 18 U.S.C.  2314.  The charges are
based on five wire transfers made in June 1988.  The transfers were
to pay liens and costs on properties owned by Reeder which had been
posted as collateral for the purchase of two insurance companies.  
Reeder's first trial in May 1996 resulted in a hung jury.  
Following a retrial in October 1996, Reeder was convicted of all
ten counts.  The district court sentenced Reeder to forty-six
months in prison and ordered him to pay restitution in the amount
of $16.5 million.  In all respects, we affirm.
                           BACKGROUND
         We review the facts of a criminal case on appeal from a
conviction in the light most favorable to the verdict.  See United
States v. Gonzlez-Maldonado, 115 F.3d 9, 12 (1st Cir. 1997).  Our
presentation of the facts draws considerably on our recent opinion
in United States v. Christopher, 142 F.3d 46 (1st Cir. 1998).
         In mid-1987, Charles Christopher and other investors
formed a holding company called Resolute Holdings, Inc.
("Resolute") for the purpose of acquiring insurance companies.  
Resolute sought to acquire American Universal Insurance Company
("American"), an insurer headquartered in Providence, Rhode Island,
and Diamond Benefits Life Insurance Company ("Diamond"), an insurer
that was licensed in Arizona and had its principal offices in
California.  Resolute, however, was a shell company, with no assets
except $250,000 in working capital.  In late 1987, Christopher and
Resolute enlisted the participation of Reeder, a California
developer who had real estate holdings and controlled several
companies, including Hill Top Developers ("Hill Top").  Reeder
agreed to contribute capital to the insurance companies in exchange
for a share in Resolute.
         In early February 1988, Reeder negotiated a deal with
Resolute.  Under the terms of Reeder's deal with Resolute, in
exchange for Reeder's capital contribution to the insurance
companies, Reeder received a 60% share of Resolute and about $2
million in yearly profit participation.  Reeder thus acquired a
controlling interest in Resolute, although the formal transfer of
Resolute shares to Reeder did not become official until June 1988.
         In addition to reaching an agreement with the respective
sellers of American and Diamond, Resolute had to obtain the
approval of state insurance regulatory authorities.  By statute,
the Rhode Island Department of Business Regulation ("RIDBR") had to
approve the sale of American, and the Departments of Insurance in
both Arizona and California had to approve the sale of Diamond.  
Resolute submitted an application, known as a Form A statement, to
each of those three states.  Each Form A required the disclosure of
extensive background and financial information about the
individuals involved in the acquisition, their business plan for
the company, and the financial means by which the company would be
acquired, so that the regulators could assess whether the
acquisition would jeopardize the interests of policyholders.
         As part of its acquisition plan submitted to the
insurance regulators, Resolute agreed to capitalize the insurance
companies by contributing Reeder's $50 million promissory note,
secured by Heritage Ranch and Indian Palms, to American.  To
capitalize Diamond, Resolute agreed to contribute Reeder's $12
million promissory note, secured by Indian Springs.
         The acquisition of Diamond had an additional component.  
Resolute had negotiated for Diamond to assume a block of annuity
policies from the Life Assurance Company of Pennsylvania ("LACOP").  
As consideration for its assumption of about $31 million in LACOP's
annuity obligations, Diamond was to receive about $29.4 million in
cash from LACOP.  Of that sum, $18 million was to be delivered to
Diamond at closing, with the remainder to follow several months
later.
         At the time of Resolute's Form A applications, all of the
Reeder properties securing Reeder's promissory notes -- Heritage
Ranch, Indian Palms, and Indian Springs -- had extensive liens on
them.  On Heritage Ranch and Indian Palms alone, the total was
about $17 million.  Those preexisting liens were significant
because they meant that American's and Diamond's security interests
would be subordinated to other mortgages on the properties.  In
addition, pre-existing liens on the collateral decreased the value
of the promissory notes, thereby decreasing the amount of capital
with which the insurance companies could do business.
         In February 1988, Reeder made a deal with Christopher
that Resolute would purchase Reeder's liens from the banks so that
the closings could go forward.  Reeder and Resolute made repeated
representations to the insurance regulators that the pre-existing
liens on the Reeder properties would be cleared by closing.  At the
same time that these representations were being made, however,
Reeder was repeatedly advised that Resolute had no means by which
to pay the debt.
         In the Form A filings submitted to Rhode Island, Arizona,
and California, Resolute represented that all pre-existing liens on
the collateral securing its promissory notes to the insurance
companies would be discharged at or before closing on Resolute's
acquisition.
         On March 10, 1988, Arizona approved Resolute's
acquisition of Diamond.  Resolute understood that, by Diamond's
closing, it still had to provide documentation demonstrating that
the pre-existing liens on the property securing the notes to
Diamond had been cleared.
         The Rhode Island regulators were particularly concerned
about the encumbrances on the property securing the promissory note
to American.  In late April, RIDBR chief legal counsel Nancy Mayer
wrote to Resolute asking whether Reeder's corporations owned
Heritage Ranch and Indian Palms "free and clear of all
encumbrances."
         Reeder later admitted that he knew that the liens would
not be paid off by the closings on the insurance companies, despite
the representations to the regulators.  Nevertheless, Reeder was
still actively involved in the acquisition of the insurance
companies.  On May 24, Reeder had a meeting with Christopher and
several other Resolute principals to decide who was going to run
the insurance companies.  Reeder, soon to be the majority
shareholder of Resolute, had the ultimate authority to make that
decision.  Against the strong opposition of the other Resolute
principals, Reeder placed Christopher in charge of the insurance
companies.
         The RIDBR scheduled an approval hearing on the American
acquisition for May 26.  On May 24, just two days prior to that
hearing -- when Reeder knew that the American closing was imminent
-- Reeder signed a number of documents relating to the purchase of
American, including a capitalization agreement that was submitted
to the RIDBR as part of the Form A application.  In the
capitalization agreement, Reeder represented that, "[t]here are no
actions, suits or proceedings, pending or threatened, to the
current actual knowledge of the Makers, effecting [sic] the $50
Million Note or any portion of the property, at law or in equity or
before or by any federal, state, municipal or other governmental
department, commission, [or] board."  This statement was not true.  
Reeder knew that suits were threatened against both Heritage Ranch
and Indian Palms, the two properties securing the $50 million
promissory note to American.
         At the time Reeder signed the capitalization agreement,
Reeder had a $10 million note outstanding with Continental Bank,
secured by Heritage Ranch.  Reeder had missed a $2.3 million
amortization payment due in October 1987.  In a meeting with
Continental in December 1987, Reeder told the bank that he did not
have the cash to meet his obligations under the loan.  On March 11,
1988, Continental notified Reeder that he was in default and that
the bank might institute foreclosure proceedings.  On April 29,
Continental demanded full payment on the loan, and on June 3, 1988,
Continental filed for foreclosure on Heritage Ranch.
         Reeder was also delinquent on several loans he had
outstanding with Home Federal Bank ("Home Fed").  Reeder owed Home
Fed more than $7 million for loans that were secured by both
Heritage Ranch and Indian Palms, and he had not made payments on
certain loans since June 1987.  On May 12, Home Fed demanded
payment in full on one of the loans secured by Heritage Ranch.
         On May 26, 1988, Rhode Island held the approval hearing
on the proposed acquisition of American by Resolute.  Resolute
maintained its position that it would pay off the pre-existing
liens on the Reeder properties securing the promissory note by
closing.  Indeed, at some point that day, although not at the
formal hearing, RIDBR Chief Counsel Mayer was told that the pre-
existing liens on the Reeder properties had been cleared.
         On May 27, 1988, the RIDBR issued a conditional order
approving Resolute's acquisition of American.  Although the
transaction closed that day, the order made clear that the transfer
of ownership would not become final until Resolute submitted final
title insurance policies for Heritage Ranch and Indian Palms "to be
effective as of the closing date which indicat[e]" that "all
mortgages, deeds of trust and the like have been paid in full and
discharged."  On June 7, 1988, California issued an order approving
Resolute's acquisition of Diamond, which Arizona had already
approved on March 10.  The extensive liens on Heritage Ranch,
Indian Palms, and Indian Springs were not paid off by May 27, when
the American purchase closed, nor by June 14, when the Diamond
purchase closed.
         On May 28, 1988, Christopher told Reeder that the
regulators had approved the American acquisition.  A few days
later, Reeder and Christopher had a private meeting to discuss the
acquisitions at Reeder's office in California.  Christopher
confirmed that the liens on Reeder's properties had not yet been
discharged.  Reeder became angry when Christopher informed him that
the Rhode Island regulators had amended the release clause
provision of Reeder's promissory note to American.
         The release clause governed the rate at which Reeder had
to pay down the balance on the $50 million promissory note to
American if he sold portions of the properties securing the note.  
Under the original provision, Reeder was required to pay American
only 110% of the appraised value of each lot sold, even though the
lots could be sold for a price considerably higher than the
appraised value.  Under the amended release clause, all monies
received from the sales of portions of the properties securing the
note had to be applied to reducing the principal balance of the
note.  Reeder could not receive any monies from the sale of the
lots until the $50 million note had been paid off in its entirety.  
Nor could Reeder take money from the insurance companies for
development costs associated with Heritage Ranch or Indian Palms.  
Reeder found the amended release clause to be "untenable," because
it deprived him of the steady cash flow he had expected from the
sale of lots at Heritage Ranch and Indian Palms.
         Reeder arranged with Christopher, in an oral agreement
with no documentation, for an $18 million "loan" to Hill Top.  The
"loan" was to be secured by Windbrook Country Club, yet another of
Reeder's properties, which was worth only $3 million.  Although
Reeder later said that, he expected that Resolute would be the
entity loaning Hill Top funds under the Windbrook "loan," Reeder
knew that Resolute had no assets except the insurance companies.  
Reeder also knew that, upon Resolute's acquisition of Diamond,
Diamond was to receive the  LACOP annuity money, the first
installment of which was in the amount of $18 million -- the same
amount as the Windbrook loan.
         On June 13, Reeder signed the documents for the Windbrook
loan.  Under the terms of the Windbrook loan, Diamond -- not
Resolute -- agreed to lend Hill Top up to $18 million to pay off
liens on Heritage Ranch, Indian Palms, and Windbrook Country Club.  
The documents were dated June 15, 1988 -- the day after the
expected Diamond closing.
         The Windbrook loan violated state regulatory
requirements.  Under Arizona insurance regulations, Diamond could
not advance loan proceeds in an amount greater than the value of
the collateral backing the loan.  In addition, it could not invest
more than 10% of its assets in a single investment.   No waiver was
requested or received for the $18 million Windbrook loan.  In
addition, the insurance regulators required that the money to pay
off the liens come from an external source.
         After Reeder's private meeting with Christopher about the
Windbrook loan, Reeder began settlement negotiations with
Continental and Home Fed over his outstanding loan obligations.  On
June 7, Reeder reached a settlement with Continental for a
"discounted note payoff" in which Reeder agreed to pay off his $10
million note to Continental for about $8.7 million.  Reeder
arranged for the payment to be due on June 16 -- two days after the
anticipated Diamond closing.
         On June 10, Resolute shareholders met in Dallas, Texas
for their first meeting.  One of Reeder's attorneys, Arthur Karma
attended the meeting as a proxy for Reeder, the controlling
shareholder.  Pursuant to Reeder's instructions, Karma voted to
make Christopher a director of both insurance companies, as well as
the new President of American and the CEO of Diamond.  In addition,
Reeder had twice instructed Karma to make certain that Christopher
paid off the Continental loan, which Reeder had settled a few days
earlier.  Karma related Reeder's message to Christopher, and
Christopher said the liens would be paid in the next few days.
         Unbeknownst to Colleen Comey, the President of Diamond,
on June 13, the day before the closing on Diamond, Christopher
directed Keith Bell, an employee of American, to open an account in
Diamond's name at Fleet Bank in Providence, Rhode Island.  On
June 15, the day after Diamond's closing, Christopher directed Bell
to have LACOP transfer the first installment of $18 million owed to
Diamond to the Fleet Bank account.
         Once the $18 million was deposited in the Fleet Bank
account, Christopher directed Bell to make a series of wire
disbursements.  Five of those transfers were pursuant to Reeder's
directions and for Reeder's benefit.
         On June 16, Reeder caused $8.7 million to be sent from
the Diamond account to Continental Bank in Chicago, per the
settlement he had reached with the bank on June 7.  This payment
extinguished the most substantial pre-existing lien on Heritage
Ranch.
         Also on June 16, 1988, Reeder caused $465,000 to be
transferred to an account of the Burrillville Land Company in Santa
Monica, California.  Reeder had no interest in that company or its
accounts.  Burrillville, however, was managed by Carlsberg
Management, which was closely associated with Reeder's businesses.  
Then, on June 17, through written instructions, Reeder had the
account manager, Theresa DeLeon, allocate the $465,000 into three
separate checks for $100,000, $315,000, and $50,000, all payable to
Hill Top.
         On June 23, 1988, Reeder caused $825,000 to be
transferred to the client trust account of James Patison, the
lawyer who had negotiated the Home Fed settlement for Reeder.  
Reeder stated that this $825,000 transfer, which he discussed with
Christopher at their private meeting in early June, involved
payments to Reeder of funds he felt he was owed by Home Fed in
connection with two joint ventures Home Fed and Reeder had engaged
in:  Whimpy Gentry and Rancho 187.  Reeder's settlement agreement
with Home Fed, however, stated that it resolved all disputes
between the parties, including those two matters.  Reeder admitted
that the insurance companies were wholly unrelated to those two
projects.  Reeder also admitted that the $825,000 transfer
represented a portion of the discount he was able to negotiate in
his settlement with Home Fed.
         On June 23, 1988, Reeder caused $459,000 to be
transferred to Carlsberg Management.  As with the earlier transfer
to Burrillville, Reeder gave DeLeon written instructions on how to
disburse the funds.  The same day the funds were received, DeLeon
cut two checks: one for $384,000 payable to Hill Top, and one for
$75,000 payable to a Reeder intercorporate account.  Reeder stated
that this wire transfer, as well as the prior June 16 transfer of
$465,000, represented the approximately $1 million discount he had
negotiated on his outstanding debt with Continental Bank.  Reeder
also admitted that he had made an agreement with Christopher at
their early June meeting to take these amounts, as compensation for
the amended release clause, for development costs at Heritage   
Ranch -- a use that was prohibited by the regulators.
         Reeder had signed the settlement agreement with Home Fed
on June 22, which required him to pay Home Fed approximately $5.9
million.  The Diamond account at Fleet Bank, however, had been
nearly exhausted by this time and did not have sufficient funds to
cover that amount.  Therefore, $3 million was transferred to
Diamond's Fleet account from an American account without any
justification or supporting documentation.
         Then, on June 24, 1988, Reeder caused approximately $5.9
million to be transferred from the Fleet account to Home Fed in
payment of Reeder's obligations to that bank.
         The total amount taken from the insurance companies for
Reeder's benefit was approximately $16.5 million, consisting of
$13.5 million taken from Diamond and $3 million taken from
American.
         By August 1988, Colleen Comey, Diamond's President, had
become concerned about the whereabouts of the LACOP money.  At that
point, as annuity holders attempted to cash in their policies,
Diamond was writing checks that were returned for insufficient
funds.  When Comey began inquiring whether the LACOP money had been
received, she learned that it was gone.  In trying to determine how
the money had been spent, she was unable to reconstruct the
transactions.  Finally, after failing to receive an adequate
explanation from Christopher, Comey called Reeder to report her
concerns about the missing $18 million and make further inquiries.  
Reeder expressed no surprise at all when Comey informed him of the
missing $18 million, but he gave her no information about the
missing money, simply telling her to speak to Christopher or
William Geary, another Resolute principal.  On September 22, 1988,
concerned that the second installment of $10 million soon due from
LACOP would likewise disappear, Comey froze the Fleet account and
alerted regulators. The next day she was fired.
                           DISCUSSION
I.  Sufficiency of the Evidence
         When a defendant challenges his criminal conviction,
claiming that the government failed to present sufficient evidence
to prove the defendant guilty of the charged crime, the court must
"view the evidence, together with all reasonable inferences that
may be drawn therefrom, in the light most favorable to the
government," United States v. Campa, 679 F.2d 1006, 1010 (1st Cir.
1982), and while so doing, must ask whether "a rational trier of
facts could have found guilt beyond a reasonable doubt." United
States v. Ingraham, 832 F.2d 229, 239 (1st Cir. 1987), cert.
denied, 486 U.S. 1009 (1988).  The court must apply this standard
both to direct and to circumstantial evidence;  "[c]ircumstantial
evidence is intrinsically no different from testimonial evidence,
and is entitled to similar weight."  United States v. Van Helden,
920 F.2d 99, 101 (1st Cir. 1990) (citations omitted).  Thus, the
government may use circumstantial evidence to prove its case.  
However, the total evidence, with all reasonable inferences made in
the light most favorable to the government, must be such that a
rational trier of fact could have found guilt beyond a reasonable
doubt.  See United States v. Mena, 933 F.2d 19, 23 (1st Cir. 1991).  
Furthermore, the government need not present evidence that
precludes every reasonable hypothesis inconsistent with guilt in
order to sustain a conviction. See United States v.
Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985), cert.
denied, 475 U.S. 1029 (1986).  Rather, the jury is at liberty to
select freely among a variety of reasonable alternative
constructions of the evidence.  See United States v. Smith, 680
F.2d 255, 259 (1st Cir. 1982), cert. denied, 459 U.S. 1110 (1983).
         A.  Wire Fraud
         Reeder argues that his wire fraud convictions cannot
stand because there is no evidence in the record that he knew that
Christopher's assurances concerning the liens were false, much less
that he shared Christopher's intent to deceive and defraud the
regulators.  See Defendant's Br. at 21.  We find his argument
unpersuasive.
         To prove wire fraud, the government must establish beyond
a reasonable doubt: (1) the defendant's knowing and willing
participation in a scheme or artifice to defraud with the specific
intent to defraud; and (2) the use of interstate wire
communications in furtherance of the scheme.  See United States v.
Sawyer, 85 F.3d 713, 723 (1st Cir. 1996).   
         Reeder challenges only the intent element.  He concedes
that Resolute and Christopher made numerous representations to the
regulators that the liens on Reeder's properties would be paid off
by closing.  He also admits that Christopher made these
misrepresentations with the intent to deceive as part of a scheme
to defraud the insurance regulators.  Reeder's argument is that the
evidence does not demonstrate that he knew those representations to
be false because he allegedly believed that Resolute would pay off
the liens.
         At trial, Reeder testified that he did not expect that
the liens would be paid off by closing, and that he did not think
that Resolute would pay off the liens before closing.  Reeder's own
testimony provided evidence that, despite the repeated
representations made to the insurance regulators that the pre-
existing liens on his properties would be cleared by closing,
Reeder knew that the liens would not be discharged at that time.
         Furthermore, Reeder was the de facto majority shareholder
of Resolute.  He admitted that the huge amount of money he was
fronting for the insurance companies was too much to be put at risk
without control of Resolute.  Although Reeder did not formally
receive his shares in Resolute until June 1988, the jury was
entitled to infer that he was the one making decisions for Resolute
before that time, as he was on May 24 when he placed Christopher in
charge of the insurance companies.  The evidence further showed
that Reeder kept in close and direct contact with Christopher
throughout the acquisition process, and Jarrell Ormand, Resolute's
lawyer in Texas, communicated with Reeder in responding to
inquiries from the RIDBR.  From this evidence, the jury could infer
that Reeder was intimately involved with Resolute's effort to
acquire the insurance companies and responsible for the
representations made to the regulators on behalf of Resolute that
the liens on his properties would be cleared by closing.
         The evidence also demonstrated that Reeder knew that
Resolute had no means by which to pay off the liens.  In letters on
March 11, May 13, and May 20, Karma and his law partner, David
Bence, informed Reeder of their increasing concern over Resolute's
failure to make any arrangements to discharge the debt.  Reeder,
however, ignored their pleas for a meeting, and instead made his
own false representation to the regulators that no suits were
threatened against the properties backing his promissory note to
American, even though two banks were about to initiate foreclosure
proceedings.  From this sequence of events, the jury could
reasonably infer that Reeder was aware of the fact that the liens
on his properties would not be paid off by closing, and that he
intended to deceive the regulators when he and Resolute made the
repeated representations that his properties would be unencumbered
upon Resolute's acquisition of the insurance companies.  See United
States v. Cassiere, 4 F.3d 1006, 1024 (1st Cir. 1993) ("Guilty
knowledge may be inferred where instances of fraud are repeatedly
brought to a defendant's attention without prompting alteration of
his facilitative conduct.") (quotation omitted).
         In support of his assertion that he believed that
Resolute would discharge his liens, Reeder relies primarily on
statements made by him, his corporations, or Christopher and his
agents that Resolute would pay off the liens.  The simple fact that
those statements were made, however, does not prove that Reeder
believed them.  Moreover, the jury was entitled not only to
disbelieve Reeder's statements, but also "[to] legitimately . . .
presume[] that the fabrication[s] w[ere] all the more proof of
[his] guilt."  United States v. Jimnez-Prez, 869 F.2d 9, 10 (1st.
Cir. 1989).
         Reeder's participation in making misrepresentations to
the regulators, his use of the wires to divert $16.5 million of the
insurance companies' funds, and his fraudulent efforts to conceal
his actions overwhelmingly establish his intentional participation
in the scheme to defraud.  Based on this evidence, a rational trier
of fact could easily have found guilt beyond a reasonable doubt.
         B.  Interstate Transportation of Stolen Property ("ITSP")
         Reeder contends that his ITSP convictions must be
overturned because the government failed to prove that he knew that
the property was taken by fraud.  We disagree.
         To convict on the five ITSP counts, the jury had to find
that Reeder transported in interstate commerce $5,000 or more that
he knew to have been stolen, converted, or taken by fraud.  SeeDowling v. United States, 473 U.S. 207, 214 (1985) (stating the
elements of 18 U.S.C.  2314).  Reeder agrees that Christopher
engaged in a scheme to defraud, and, as explained above, the
evidence demonstrates that, after the insurance companies were
acquired, Reeder entered into an agreement with Christopher to
divert $16.5 million of the insurance companies' funds for his own
purposes and structured the transactions to conceal his activities.  
Based on that evidence alone, the jury could reasonably infer that
Reeder knew that the money he transported had been taken by fraud.
II.  Government's Closing Argument
         Reeder argues that his convictions must be reversed
because the government's closing argument misled the jury into
finding guilt based on conduct not amounting to fraud.  At trial,
Reeder did not object to any portion of the prosecutor's closing
argument.  Therefore, his claim is reviewed only for plain error.  
See United States v. Young, 470 U.S. 1, 6, 14-15 (1985).
         Reeder contends that the prosecutor argued that the jury
could convict Reeder of wire fraud based: (1) on his admission that
he took $1 million from the insurance companies in response to the
amended release clause; (2) on his violation of a state regulation
by failing to secure a waiver from Arizona for the Windbrook loan;
or (3) on his failure to comply with the Windbrook contract terms
by taking money for purposes other than the discharge of liens.  
Reeder contends that such proof would be insufficient to sustain
his convictions because it would not constitute "a fraud in
obtaining the property."  Defendant's Br. at 30.
         Contrary to Reeder's assertions, the government did not
argue to the jury that it could convict Reeder of fraud if it found
simply that he had taken $1 million from the insurance companies,
violated a state regulation, or disregarded the loan terms.
         We consider the prosecutor's comments within the
framework and context of the entire case. See United States v.Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993).  Evidence at
trial demonstrated that Reeder: (1) admitted that he took $1
million from the insurance companies; (2) failed to disclose or
secure a waiver from the state regulators for the Windbrook "loan"
despite his knowledge that insurance company transactions were
subject to strict oversight; and (3) took money from the insurance
companies for purposes unrelated to the business of the insurance
companies and not covered by the terms of the Windbrook "loan."
         In his closing argument, the prosecutor argued that this
evidence, in the context of and in combination with other evidence,
demonstrated Reeder's knowing participation in the fraudulent
diversion of insurance company assets and his intent to defraud.  
See, e.g., United States v. Woodward, 149 F.3d 46, 62 (1st Cir.
1998) (violation of state law probative of intent to deceive in
mail fraud case); see id. at 57 ("The jury was entitled to infer
[defendant's] intent from the circumstances surrounding his
actions, from indirect, as opposed to direct, evidence.")
(quotation omitted); see also United States v. Tajeddini, 996 F.2d
1278, 1282 (1st Cir. 1993) ("[T]he prosecutor is entitled, in
closing, to ask the jury to draw warrantable inferences from the
evidence admitted during trial.").
         There is no reason to believe that the jury erroneously
concluded that it could convict simply because Reeder violated a
regulatory order or breached a contract.  Defense counsel
repeatedly warned the jury that Reeder was "not on trial for
violating a conditional order" or "for violation of a state
statute."  They further informed the jury that "[t]his is not a
breach of contract case," and that the jury had to decide whether
Reeder "knowingly and willfully obtain[ed] the money through deceit
or fraud."  Furthermore, the trial court's instructions cured any
alleged error in the closing argument.  The court correctly
instructed the jury on the elements of the offense for both the
wire fraud and the ITSP counts.  The court specifically instructed
the jury that "[t]he violation of an insurance regulatory order or
state law is not itself a federal crime."
III.  Variance
         Reeder argues that the alleged theories of conviction
offered by the prosecution in its closing argument varied from the
theory of conviction alleged in the indictment.  Specifically, he
contends that the government urged the jury to convict on what he
terms "non-fraud" theories: (1) the admission that Reeder took $1
million; (2) the failure to get a waiver for the Windbrook loan;
and (3) the failure to comply with the contract terms.  He urges
this Court to reverse because these "non-fraud" theories of
conviction varied from the theory of fraud charged in the
indictment.  Reeder argues that his rights were substantially
affected by the alleged variance because the jury was allowed to
convict on a theory insufficient to constitute the federal crime of
wire fraud.  Reeder's variance argument is simply a restatement of
his claim that the jury may have convicted him on a legally
insufficient theory based on the government's closing argument.  
Couched in different terms, it is still unconvincing.
         A variance occurs when the proof at trial paints a
portrait that differs materially from the scenario detailed in the
indictment.  See United States v. Vavlitis, 9 F.3d 206, 210 (1st
Cir. 1993).  A variance requires reversal of a conviction only if
it is both material and prejudicial, for example, if the variance
works a substantial interference with the defendant's right to be
informed of the charges.  See Vavlitis, 9 F.3d at 210.  When, as
here, the indictment gives a defendant particular notice of the
events charged, and the proof at trial centers on those events,
minor differences in the details of the facts charged, as
contrasted to those proved, are unlikely to be either material or
prejudicial.
         There was no variance between the evidence presented at
trial and the indictment.  The proof at trial is necessarily more
detailed than the facts alleged in the indictment, which is simply
a "plain, concise and definite written statement of the essential
facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  
The indictment charged a scheme to defraud encompassing the
acquisition of insurance companies and the diversion of the
companies' assets.  Paragraphs 28 to 44 of the Redacted Indictment
discuss the fraudulent activity undertaken after the acquisition of
the insurance companies, and specifically refer to the Windbrook
loan. See RI  36-38.  To the extent that: (1) the admission
concerning taking $1 million because of the amended release clause;
(2) the failure to secure a waiver for the Windbrook loan; and (3)
the failure to comply with the Windbrook loan terms were not
specifically detailed in the indictment, these facts did not
materially vary the nature of the charged fraudulent scheme.
         No prejudice resulted because Reeder was not deprived "of
sufficiently specific information to prepare a defense, unfairly
surprise[d] . . . at trial, or isolate[d] . . . from the
constitutional protection against double jeopardy."  United States
v. Fermn Castillo, 829 F.2d 1194, 1197 (1st Cir. 1987).
IV.  Unanimity
         Reeder argues that the district court erred in failing to
instruct the jurors that they had to unanimously agree on "the
theories and acts of fraud" underlying their guilty verdict.  We
find no such error.
         In Schad v. Arizona, the Supreme Court held that, in
returning general verdicts in cases in which the government has
alleged in a single count that the defendant committed the offense
by one or more specified means, jurors are not required to agree
upon a single means of commission.  See 501 U.S. 624, 631 (1991)
(plurality opinion); id. at 649 (Scalia, J., concurring in part and
concurring in the judgment) (explaining that, for example, where "a
woman's charred body has been found in a house, and there is ample
evidence that the defendant set out to kill her," the jury does not
have to agree on whether defendant "strangled victim to death," or
"left her unconscious and set the fire to kill her").  While a jury
must agree on all of the elements of an offense, it need not agree
on the means by which all the elements were accomplished.  
         Here, the jury was instructed that one of the elements of
the wire fraud counts was the defendant's knowing participation in
a scheme to defraud.  The government alleged and proved a single
scheme to defraud.  While the jurors had to unanimously agree that
Reeder knowingly participated in a scheme to defraud -- an element
of the crime -- they did not, contrary to Reeder's contention, have
to unanimously agree on each piece of evidence offered to prove
Reeder's participation.
V.  Attorney-Client Privilege
         At trial, Reeder objected to the district court's
admission of Karma's testimony about his 1991 conversation with
Reeder, during which Reeder asked for Karma's help in covering up
his use of insurance company money.  The district court found that
Karma's testimony was not protected by the attorney-client
privilege on two bases.  First, the court determined that the
conversation was admissible under the crime-fraud exception to the
attorney-client privilege.  Second, the court determined that
Reeder had waived the attorney-client privilege by failing to
object to Karma's extensive prior testimony about his
communications with Reeder relating to the insurance company
transactions.  We agree with the district court that Reeder's  
conversation with Karma was admissible under the crime-fraud
exception.
         The importance and sanctity of the attorney-client
privilege is well established.  See  Upjohn v. United States, 449
U.S. 383 (1981).  Because it "'withhold[s] relevant information
from the factfinder,'" United States v. Zolin, 491 U.S. 554, 562
(1989) (citation omitted), the "'attorney-client privilege does not
apply where the client consults an attorney to further a crime or
fraud.'"  Motley v. Marathon Oil Co., 71 F.3d 1547, 1551 (10th Cir.
1995) (quoting In re Grand Jury Proceedings (Company X), 857 F.2d
710, 712 (10th Cir. 1988)).  "It is the purpose of the crime-fraud
exception to the attorney-client privilege to assure that the 'seal
of secrecy,'" between lawyer and client does not extend to
communications 'made for the purpose of getting advice for the
commission of a fraud' or crime."  Zolin, 491 U.S. at 563
(citations omitted).  "Thus, the attorney-client privilege is
forfeited inter alia where the client sought the services of the
lawyer to enable or aid the client to commit what the client knew
or reasonably should have known to be a crime of fraud."  United
States v. Rakes, 136 F.3d 1, 4 (1st Cir. 1998) (emphasis added).
         In order to successfully invoke the crime-fraud
exception, the government must make a prima facie showing that the
attorney's assistance was sought in furtherance of a crime or
fraud.  See In re Grand Jury Subpoenas ("Subpoenas"), 144 F.3d 653,
660 (10th Cir. 1998); United States v. Jara, 973 F.2d 746, 748 (9th
Cir. 1992).  A district court's determination to admit evidence
under the crime-fraud exception is reviewed for abuse of
discretion. See Subpoenas, 144 F.3d at 659; In re Grand Jury
Proceedings, 102 F.3d 748, 751 (4th Cir. 1996); In re Sealed Case,
754 F.2d 395, 399-400 (D.C. Cir. 1985).  The facts underlying the
district court's decision on the crime-fraud exception are reviewed
for clear error.  See United States v. Jacobs, 117 F.3d 82, 87 (2d
Cir. 1997).
         The record demonstrates that, in their 1991 conversation,
Reeder told Karma that he had "a problem" with some of the
insurance company transactions.  Reeder then admitted that he had
taken more than $1 million from the insurance companies, and handed
Karma a document indicating that more than $1 million from the
insurance companies had not been properly applied.  Thereafter,
Reeder stated that he could explain how he had used the money.  
After reviewing the transactions, Karma said, "This won't work.  
The monies that were sent by American Universal were for work that
had been performed for liens that were already on the property."  
Reeder responded, "No problem. 'I can get my friends to write new
invoices and we'll pay them as of 1988.'"  Karma told Reeder that
to do so would be asking 20-30 people to commit fraud, that he did
not want any part of it, and he advised Reeder not to do it.  
Reeder then stated, "I thought maybe you could come up with some
idea."  Karma once again refused to help Reeder cover up the
transactions,  responding, "Wayne, it's a crime.  I don't want
anything to do with it.  Don't ever discuss it with me again."  The
district court's determination that the government made a prima
facie showing that Reeder solicited Karma's assistance to cover up
his criminal conduct was not an abuse of discretion.  Reeder sought
Karma's services to enable him to commit what he knew or reasonably
should have known to be fraud.  See Rakes, 136 F.3d at 4.
         Reeder argues that the crime-fraud exception does not
apply because he was simply asking Karma's advice about whether he
could solve a problem in a particular manner.  The record belies
Reeder's assertion.  Reeder did not merely ask Karma whether
backdating invoices would be illegal, which would be equivalent to
Reeder's hypothetical about "the head of a corporation asking his
counsel if he can condition a campaign contribution to a politician
on the politician's promise to support legislation."  Here, Reeder
twice asked for Karma's help in a cover-up of Reeder's fraudulent
diversion of the insurance companies' money.  See Subpoenas, 144
F.3d at 660 ("The exception does not apply if the assistance is
sought only to disclose past wrongdoing, . . . but it does apply if
the assistance was used to cover up and perpetuate the crime or
fraud.").  Therefore, the district court did not abuse its
discretion in admitting Karma's testimony under the crime-fraud
exception.
         Because we hold that the conversation was admissible
under the crime-fraud exception, there is no need to reach the
waiver issue.
VI.  Evidentiary Rulings
         Reeder challenges several of the district court's
evidentiary rulings. We review a district court's rulings on
admissibility and relevance for abuse of discretion.  See Cassiere,
4 F.3d at 1018.  Under Fed. R. Evid. 403, relevant evidence may be
excluded if its probative value is substantially outweighed by the
danger of prejudice, confusion of the issues, or misleading the
jury.  This Court grants the trial court "especially wide latitude"
when Rule 403 balancing is the subject of review.  See United
States v. Rivera-Gmez, 67 F.3d 993, 996 (1st Cir. 1995).  "[O]nly
rarely -- and in extraordinary circumstances -- will we, from the
vista of a cold appellate record, reverse a district court's on-
the-spot judgment concerning the relative weighing of probative
value and unfair effect."  Williams v. Drake, 146 F.3d 44, 47 (1st
Cir. 1998) (quotation omitted).
         First, Reeder argues that the district court erred in
excluding testimony from Karma and Reeder that the Windbrook loan
was restructured to substitute Resolute for Diamond as the payor.  
The crime was completed when Reeder made the wire transfers in June
1988, thereby diverting the insurance companies' funds for his own
purposes.  Evidence of elaborate accounting transactions undertaken
after June 1988 to restructure the Windbrook loan are irrelevant to
Reeder's state of mind at the time that he misappropriated the
$16.5 million.  In any event, any error in the exclusion was
harmless because the district court allowed both Reeder and Ormand
to testify that the Windbrook loan was rebooked as a loan from
Resolute.  See United States v. Brown, 938 F.2d 1482, 1488 (1st
Cir. 1991) (any error in the exclusion of evidence is rendered
harmless where "defendant's theory . . . was manifested to the jury
through testimony which was allowed").
         Second, Reeder challenges the district court's exclusion
of notes taken by Bence, Karma's law partner, during a June 13,
1988, conversation with Ormand, to the effect that Ormand did not
think that the Windbrook loan violated state insurance laws.  This
evidence was inadmissible because Reeder failed to lay a proper
evidentiary foundation.  Reeder sought to introduce this exhibit
through Karma.  Karma testified, however, that he did not know what
Bence discussed with Ormand that day.  Reeder thus sought to
introduce "Mr. Ormand's opinion as expressed to Mr. Bence as
recorded by Mr. Bence on a paper that's in this witness's [Karma's]
file," about a conversation that Karma had already testified he
knew nothing about.  The district court suggested that the document
might be admissible through Ormand, that defense counsel could
offer it through Bence, or that Reeder could testify about it.  
Reeder did not pursue any of these avenues.  Consequently, the
district court did not abuse its discretion in determining that
this document could not be introduced through Karma.
         Third, Reeder argues that the district court erroneously
excluded evidence demonstrating that various people knew about the
Windbrook loan.  Reeder sought to introduce through Durfee,
American's Chief Financial Officer, a letter that Durfee wrote to
Ormand referring to the documents that were required in order to
make certain booking entries at American regarding the
restructuring of the Windbrook loan.  The government objected based
on relevance.  The court queried where the original documents
supporting the book entries referred to in the letter were, and
defense counsel stated that he did not have them.  The court then
excluded the exhibit on the basis that this evidence was "secondary
at best" and explained, "I think we need something a little
better."  The court also stated, "Certainly, you can ask this
witness if he has a recollection if this was recorded on the
books."  Defense counsel failed to ask that question.  The district
court did not abuse its discretion in ruling that Reeder had failed
to lay a proper foundation for the admissibility of the Durfee
letter by failing to produce the documents that would support the
accounting entries discussed in the letter.
         Later, Reeder sought testimony from Durfee as to whether
the Windbrook loan was restructured so that it became a receivable
of Resolute rather than Diamond.  As discussed above, the district
court did not exceed its discretion in determining that the
relevance of that testimony was substantially outweighed by the
confusion it would bring to the case.  Moreover, Durfee was allowed
to testify that he was aware of the Windbrook loan and of the wire
transfers from Diamond's account at Fleet Bank, thereby supporting
Reeder's defense that many people were aware of the loan.
         On re-cross examination of Ormand, Reeder sought to
introduce an August 9, 1988, letter Ormand sent to one of
Resolute's other lawyers that discussed some of the transactions
involved in the restructuring of the Windbrook loan.  Ormand
testified that he did not know if a copy was mailed to Comey,
Diamond's President, but that a copy "probably was sent" to her.  
Comey had testified that she did not remember receiving the letter.  
The district court sustained the government's objection that the
letter was inadmissible hearsay and irrelevant.  Reeder argues that
this evidence would have demonstrated that Diamond executives were
aware of the restructuring, and would have refuted Comey's prior
testimony that she had difficulty obtaining information about the
whereabouts of the LACOP money.
         The district court's ruling was proper.  First, the
document was inadmissible hearsay with respect to the facts
contained within it.  Second, the document was not admissible to
impeach Comey, because Reeder failed to establish a proper
foundation that the letter was even sent to Comey, let alone
whether she received it.  Third, the district court's decision that
the evidence was outside the limited scope of a re-cross
examination was not an abuse of discretion.  Fourth, the district
court's decision that evidence relating to the details of the
restructuring was irrelevant was not an abuse of discretion.
         Finally, Reeder sought to introduce notes Ormand took
during a March 1988 conversation with Susan Gallinger, Resolute's
local counsel in Arizona, in which they discussed the feasibility
of having Diamond purchase the liens.  The court properly sustained
the government's objection that the notes were inadmissible
hearsay.  Reeder does not even attempt to argue that the district
court's ruling was erroneous.  Nor does Reeder explain how this
evidence was relevant to demonstrating that regulators or insurance
company executives were aware of the Windbrook loan, or how the
exclusion of this evidence affected his defense.  Thus, the
evidence was properly excluded.
         Contrary to Reeder's assertion, the district court's
evidentiary rulings taken together did not amount to a Sixth
Amendment violation eviscerating his defense.  Under the
Constitution, a defendant "does not have an unfettered right to
offer [evidence] that is incompetent, privileged, or otherwise
inadmissible under standard rules of evidence."  Montana v.Egelhoff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484
U.S. 400, 410 (1988)); United States v. Kepreos, 759 F.2d 961, 964
(1st Cir.) (same), cert. denied, 474 U.S. 901 (1985).  The district
court's rulings were proper and within its discretion.
VII.  Sentencing Issues
         Reeder was sentenced under Guideline  2F1.1 of the 1988
Sentencing Guidelines Manual.  His base offense level was 6.  The
court imposed an 11-level upward adjustment because the amount of
loss involved exceeded $5 million.  In imposing the upward
adjustment, the district court found that the loss in this case was
$16.5 million, the money Reeder had Christopher divert from the
Fleet Bank account for Reeder's benefit.  The court added two more
offense levels because the offense involved more than minimal
planning or a scheme to defraud more than one victim, and imposed
a four-level role in the offense enhancement.  As a result,
Reeder's total offense level was determined to be 23.  Reeder was
assigned to Criminal History Category I, resulting in a guidelines
range of 46-57 months.  The district court sentenced him to 46
months of imprisonment.  Reeder argues that the district court: (1)
incorrectly calculated the amount of the loss; and (2) incorrectly
imposed a four-level role in the offense enhancement.  Neither
argument is persuasive.
         A.  Loss calculation
         Reeder challenges the district court's loss calculation.
He argues that the $16.5 million figure cannot be used in
calculating his offense level because the government argued in the
Christopher case that Christopher alone was responsible for that
loss.
         Under the Guidelines, loss is the "value of the property
taken."  U.S.S.G.  2B1.1 comment. 2 (1988) (cross-referenced from
2F1.1)).  After adding 11 levels to Reeder's base offense level
because the amount of loss exceeded $5 million, the court declined
to grant a downward departure based on Reeder's argument that the
loss amount overstated the seriousness of his offense because
Christopher contributed to the loss.
         "[T]he victim loss table in  U.S.S.G. 2F1.1(b)(1)
presumes that the defendant alone is responsible for the entire
amount of victim loss specified in the particular loss range
selected by the sentencing court."  United States v. Gregorio, 956
F.2d 341, 346 (1st Cir. 1992).  Any portion of the total loss
sustained by the victim as a consequence of factors extraneous to
the defendant's criminal conduct is not deducted from total "victim
loss" prior to the determination of the applicable guideline
sentencing range pursuant to  U.S.S.G.  2F1.1(b)(1).  See id. at
347 ("victim loss" table encapsulates "heartland" sentencing
formula for reflecting approximate total "victim loss" in the
guideline sentencing range).  Rather, whatever distortive effects
extraneous causes may have had on the total "victim loss"
calculation may warrant a departure from the applicable guideline
sentencing range.  See  U.S.S.G. 2F1.1, comment. (n. 10)
("downward departure may be warranted" where "total dollar loss
that results from the offense may overstate its seriousness," which
"typically occur[s]" when defendant's fraud "is not the sole cause
of the loss"); United States v. Kopp, 951 F.2d 521, 531 (3d Cir.
1991) ("To the extent actual loss had other, more proximate causes,
a discretionary downward departure -- but not a mandatory 'loss'
adjustment -- might be appropriate.").
         We lack jurisdiction to review the district court's
decision not to depart downward under the long-standing rule that
"a criminal defendant cannot ground an appeal on a sentencing
court's discretionary decision not to depart below the guideline
sentencing range."  United States v. Pierro, 32 F.3d 611, 619 (1st
Cir. 1994), cert. denied, 513 U.S. 1119 (1995);  see generally,
United States v. Tucker, 892 F.2d 8, 9 (1st Cir. 1989) (holding
that the defendant may not appeal a district court's decision not
to depart downward).
         Reeder attempts to circumvent the limitations on this
Court's review of departure decisions by recasting his argument as
an attack on the loss amount used in calculating the adjusted
offense level.  This Court has clearly held, however, that  

         [a]ny portion of the total loss sustained by
         the victim as a consequence of factors
         extraneous to the defendant's criminal conduct
         is not deducted from total "victim loss" prior
         to the determination of the applicable
         guideline sentencing range . . . . Rather,
         whatever distortive effects extraneous causes
         may have had on the total "victim loss"
         calculation may warrant a departure from the
         applicable [guideline range].

United States v. Shattuck, 961 F.2d 1012, 1016-17 (1st Cir. 1992).  
Thus, Reeder's argument that the district court erred in failing to
consider other causes, such as Christopher's participation, for the
loss in calculating Reeder's adjusted offense level is incorrect as
a matter of law.
    Second, Reeder argues that the loss amount attributed to
him should be offset by the property that was eventually forfeited
to the insurance companies.  That contention is foreclosed by our
decision in Christopher.  As we stated there: "To reduce the loss
by the value of the foreclosed collateral . . . would double count:
the insurance companies were entitled to the protection of lien-
free collateral without having to reduce their own capital in order
to pay off the liens."  Christopher, 142 F.3d at 55.  Thus,
Reeder's effort to distinguish himself from Christopher on the
basis that Reeder contributed properties to the companies is
unavailing.  If not for Reeder's diversion of funds, the insurance
companies would have the forfeited collateral and the $16.5
million.  As the district court stated, "What [Reeder] want[s] is
credit for what he left in the bank after he robbed it."

    B.  Offense Enhancement
    Reeder challenges the four-level enhancement for his role
as an organizer or leader of a criminal activity that involved (1)
five or more participants or (2) was otherwise extensive.  See  
U.S.S.G.  3B1.1(a).  Reeder contends only that he did not lead or
organize five or more persons who were "criminally responsible" for
the offense.  He makes no argument that the criminal activity was
not "otherwise extensive," the basis for the district court's
enhancement.  United States v. Rostoff, 53 F.3d 398, 413 (1st Cir.
1995) (extensiveness prong does not depend on number of
participants).  Reeder's assertion that Christopher was the true
leader is irrelevant.  The district court found that Reeder had
ultimate control of Resolute, placed Christopher in charge of the
insurance companies, and directed the disposition of monies taken
from the companies.  A careful review of the record leaves no doubt
as to the extensiveness of the criminal enterprise.
                           CONCLUSION
    For the reasons stated in this opinion, we affirm.

</body>

</html>