**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NORA CHISOLM; TINA WILCE; LAURA
RICHARDS,
Plaintiffs-Appellants,

and

STARLETTE SEAMSTER,
Plaintiff,

v.

TRANSOUTH FINANCIAL CORPORATION,
Defendant-Appellee,

and

CHARLIE FALK'S AUTO WHOLESALE
INCORPORATED; JB COLLECTION
CORPORATION,

Defendants,

CAROLYN L. NOLEN; GERALDINE B.
WILLIAMS; PAUL T. KAZMIERSKI;
RAYMOND L. RAASCH; AVA
HOWINGTON; PETER GRAY; JANICE M.
DIXON; BRENDA POWELL; TIMOTHY S.
BOOKER,
Claimants,

FALK FINANCE, INCORPORATED;
CHARLES FALK, SR.; CHARLES
FALK, JR.; KATHERINE FALK;
ANDERSON & STRUDWICK,
INCORPORATED; ARTHUR TRUMAN
GOODSON; WILLA JEAN COLLINS,
Movants.

No. 95-2629

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
John A. MacKenzie, Senior District Judge.
(CA-93-632-2)

Argued: April 1, 1996

Decided: September 10, 1996

Before HALL and MOTZ, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Vacated and remanded with instructions by published opinion. Judge
Hall wrote the opinion, in which Judge Motz and Senior Judge Butz-
ner joined.

_____

**COUNSEL**

**ARGUED:** George Robert Blakey, UNIVERSITY OF NOTRE
DAME, Notre Dame, Indiana, for Appellant. Gregory Neil Stillman,
HUNTON & WILLIAMS, Norfolk, Virginia, for Appellee. **ON
BRIEF:** Kieron F. Quinn, F. Paul Bland, Jr., LAW OFFICE OF
KIERON QUINN, Baltimore, Maryland, for Appellant. Benjamin V.
Madison, III, HUNTON & WILLIAMS, Norfolk, Virginia, for
Appellee.

_____

**OPINION**

HALL, Circuit Judge:

The appellants are three of four plaintiffs who filed a putative class
action against appellee TranSouth Financial Corporation and others,
seeking redress under the Racketeer Influenced and Corrupt Organi-
zations Act (RICO), 18 U.S.C. § 1961 et seq., for damages they sus-

2

tained as victims of a "revolving repossession" scheme. The district court entered a final judgment dismissing the action as to TranSouth under Fed. R. Civ. P. 12(b)(6), because the plaintiffs had failed to allege in their complaint that, following the repossession of their vehicles, they had relied to their detriment on the written notices of sale mailed to them by TranSouth.

In the wake of the judgment, the plaintiffs moved to amend their complaint, but the district court denied the motion because it believed that the plaintiffs could prove no set of facts establishing that they had relied on the mailings. We hold that the district court's denial of the plaintiffs' motion to amend was an abuse of its discretion; we thus vacate the court's judgment and remand with instructions to permit the amendment.

I.

A.

We review de novo the district court's dismissal of the plaintiffs' complaint under Rule 12(b)(6). Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994), cert. denied, 115 S. Ct. 1956 (1995). We must accept the well-pled allegations of the complaint as true, and we must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiffs. Id.; Little v. Federal Bureau of Investigation, 1 F.3d 255, 256 (4th Cir. 1993).

According to the complaint, TranSouth conspired with Charlie Falk's Auto Wholesale, Inc., and JB Collection Corporation, both of Norfolk, Virginia, to effect an automobile "churning" or revolving repossession scheme. Falk's sold used vehicles at inflated prices, offering to arrange financing at interest rates as high as thirty percent. Under the terms of the financing contracts, Falk's retained a security interest in the vehicles pending full repayment of the loan by the borrower. Falk's then assigned the secured notes to TranSouth, agreeing to buy back the notes for a fixed price -- usually $1,000 to $1,500 -- in the event of the borrower's default.

3

If a borrower missed a payment, TranSouth had the vehicle repossessed.**1** It then mailed a"Notice of Private Sale," giving the borrower an opportunity to redeem the vehicle.**2** Any vehicles that were not redeemed were retransferred, with the accompanying notes, to Falk's for the prearranged consideration.**3**

Upon repurchasing the notes, Falk's assigned them to JB, its wholly-owned subsidiary. JB then demanded payment from the borrowers for the "deficiency" between the loan balance and the price obtained by the "sale" of the vehicle, i.e., the retransfer price. If the borrower failed to pay, JB filed a deficiency action in state court for the stated amount. On occasion, JB also claimed attorney fees of twenty-five percent, notwithstanding that it had filed suit without the assistance of counsel.

While JB was trying to collect from the borrowers, Falk's resold the repossessed vehicles for about the same price as (or even more than) it had previously, starting the process all over again. The original borrowers were never notified of these subsequent, legitimate

_____

**1** TranSouth usually employed a subsidiary of Falk's to repossess the automobiles, and the vehicles were frequently taken to a lot leased from Falk's by TranSouth.

**2** Va. Code Ann. § 8.9-504(3) (Michie 1991) provides that, upon the borrower's default under a security agreement, "[d]isposition of the collateral may be by public or private proceedings. . ... [R]easonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. . . ."

**3** These retransfers were not actually "sales" under Virginia law:

> A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this Title.

Va. Code Ann. § 8.9-504(5) (Michie 1991) (emphases supplied).

4

sales; the amount of the purchase price was not credited to the deficiencies, and the borrowers were not paid any resultant surplus.[4]

B.

On June 17, 1993, four victims of the scheme filed a complaint in the district court against Falk's, JB, and TranSouth. The complaint alleged that the three had violated various provisions of RICO, and that JB had failed to comply with the Fair Debt Collection Act, 15 U.S.C.A. § 1692 et seq. (West 1982). The plaintiffs also asserted state law claims against each defendant for violations of Virginia's Consumer Protection Act and its version of the Uniform Commercial Code,[5] and for common law fraud and conspiracy.

The matter was referred by the district court to a magistrate judge to conduct hearings and make proposed findings. The magistrate judge issued his report and recommendation on November 19, 1993, wherein he concluded that the RICO claims should be dismissed (as to TranSouth) or judgment granted on the pleadings (as to Falk's and JB). See Fed. R. Civ. P. 12(b)(6), (c).

The magistrate judge further recommended that summary judgment be granted to JB on one plaintiff's FDCA claim, because the statute

_____

[4] The case of plaintiff Starlette Seamster illustrates the effect of the scheme on its victims. On August 21, 1987, Seamster purchased a 1984 Dodge Aries on credit from Falk's for $6,492. Falk's assigned the loan to TranSouth, agreeing to buy back the note for $1,500 in the event of Seamster's default, which indeed occurred about fourteen months later. TranSouth repossessed the car and mailed its "Notice of Private Sale" to Seamster, who failed to respond. Falk's repurchased the loan, and JB demanded payment of the $2,743 "deficiency" between the $1,500 repurchase price and the outstanding loan balance; in March 1989, with no payment forthcoming, JB filed suit. On May 20, 1989, Falk's resold the Aries for $6,300, only $192 less than what Seamster had paid for it almost two years earlier, and $2,057 more than the balance of her loan. Notwithstanding this windfall, JB neither remitted any of the surplus to Seamster nor withdrew its lawsuit.
[5] Va. Code Ann. §§ 59.1-196 et seq. (Michie 1992 & Supp. 1996), and 8.1-101 et seq. (Michie 1991 & Supp. 1996).

5

of limitations had expired. Lastly, the magistrate judge concluded that the state law claims against TranSouth should be dismissed without prejudice because no viable federal claim against it remained. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966). The district court adopted the magistrate judge's proposed disposition. Chisolm v. Charlie Falk Auto Wholesalers, Inc., 851 F. Supp. 739 (E.D. Va. 1994). On May 11, 1994, the court denied the plaintiffs' alternative motions for reconsideration or to amend the complaint.

C.

On July 27, 1994, the plaintiffs settled with Falk's and JB as to the remaining FDCA and state law claims; a written "stipulation of settlement" was filed in the district court on October 13, 1994. On August 3, 1995, the court approved the settlement, and it dismissed the plaintiffs' claims against Falk's and JB with prejudice.

The accompanying order certified two classes for the purposes of settlement only. Under the terms of their agreement with the plaintiffs, Falk's and JB agreed to forgive approximately $10 million in deficiency judgments and to pay $400,000 to the class and its attorneys. The companies also agreed to conduct all future dispositions of repossessed automobiles in compliance with Virginia law. Final judgment having been entered in the matter, three of the plaintiffs now appeal the district court's dismissal of two of their four RICO claims against TranSouth.

II.

A.

The appellants maintain that TranSouth was more than just an unwitting participant in the scheme, and that its actions violated two distinct provisions of RICO: 18 U.S.C. §§ 1962(a) and (d). Subsection (a) provides, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of

6

racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

Subsection (d) makes it a crime to conspire to violate any of the section's substantive provisions, including Subsection (a).

"Racketeering activity" refers to an assortment of crimes, one of which is federal mail fraud. See 18 U.S.C.A.§ 1961(1) (West Supp. 1996). A "pattern" requires, at a minimum, two acts of racketeering activity within ten years. 18 U.S.C.A. § 1961(5) (West 1984); Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 n.14 (1985). The appellants assert that TranSouth committed mail fraud each time that it notified a defaulting borrower that his or her repossessed vehicle would, if not redeemed, be disposed of at a private "sale." According to the appellants, the notice was intentionally misleading because TranSouth knew that a transfer of collateral under a repurchase agreement was not a "sale" at all. See note 3, supra.

RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . ." 18 U.S.C.A. § 1964(c) (West Supp. 1996). The government need not prosecute a RICO violation as a prerequisite to the filing of a civil suit against the alleged violator. Sedima, 473 U.S. at 493.

B.

The elements of mail fraud are (1) a scheme disclosing an intent to defraud, and (2) the use of the mails in furtherance of the scheme. See Pereira v. United States, 347 U.S. 1, 8 (1954). Although the crime of common law fraud requires the intended victim to have justifiably and detrimentally relied on the defendant's misrepresentation, no such "reliance" element must be proved to obtain a conviction for mail fraud. See Armco Indus. Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 481-82 (5th Cir. 1986). Thus, assuming that TranSouth,

7

through its agents, mailed the notice letters with the intent to defraud the borrowers by facilitating the churning scheme, it committed mail fraud. By mailing many such letters, it may have engaged in a pattern of activity sufficient to establish one or more RICO violations.

The difficulty in this case lies in § 1964(c)'s requirement that, in order to recover damages in a civil action, a person be injured in his business or property "by reason of" a § 1962 violation. See Section II-A, supra. The statute is not so broad as it first seems:

> This language can of course be read to mean that a plaintiff is injured "by reason of" a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a "but for" cause of plaintiff's injury. This conclusion is hardly compelled, however, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that the Act should not get such an expansive reading.

Holmes v. Securities Investor Protection Corp. , 503 U.S. 258, 265-66 (1992) (footnotes and citations omitted). Consequently, it is not enough that a civil RICO plaintiff prove that, but for the defendant's violation, he would not have been injured; he must also show that the violation proximately caused the harm. Id. at 268; Brandenburg v. Seidel, 859 F.2d 1179, 1189 (4th Cir. 1988). The pertinent inquiry in determining the existence of proximate, or "legal" cause, is "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Brandenburg at 1189, quoting Prosser & Keeton, Torts, § 42 p. 272 (5th ed. 1984).

In Brandenburg, depositors of an insolvent Maryland savings and loan association brought civil RICO claims against former officers and directors of the equally insolvent Maryland Savings-Share Insurance Corporation (MSSIC), a quasi-public entity established by the state legislature to regulate S&Ls and insure their deposits. The depositors asserted, among other things, that MSSIC's print advertisements and promotional materials, touting the security of the deposits that it insured, persuaded them to deposit their funds in member institutions. In addition, newspaper advertisements carrying the MSSIC

8

seal, but placed by the savings and loan itself, were said to have encouraged the deposit of more funds than MSSIC could safely insure. MSSIC's advertisements and promotional literature were alleged to have intentionally conveyed the misleading impression that it was a state agency and that its depositors' accounts were insured by the state. The depositors maintained that the deceptive materials violated the federal mail fraud statute.

We held, inter alia, that the depositors had failed to allege a sufficient causal connection between their losses and MSSIC's purported crimes. Although we acknowledged that the agency's representations might have induced deposits beyond its capacity to insure them, and thus may have been a cause-in-fact of the insolvency, we concluded that the depositors' losses were proximately caused by the saving and loan's failure to maintain adequate reserves, in conjunction with MSSIC's negligent dereliction of its oversight responsibilities. Because any injury suffered by the depositors to their property was not "by reason of" any racketeering activity proscribed by § 1961(1), we affirmed the district court's dismissal of the RICO claims against MSSIC.

C.

Our decision in Brandenburg essentially bifurcated the "by reason of" analysis. We said that, where the predicate act giving rise to civil liability under RICO was alleged to have been mail fraud, prospective plaintiffs must, in order to demonstrate their standing to sue,[6] plausibly allege both that they detrimentally relied in some way on the fraudulent mailing, see 859 F.2d at 1188-89, and that the mailing was a proximate cause of the alleged injury to their business or property. Id. at 1189-90. Though our decision focused primarily on the depositors' inability to allege proximate cause, we also noted that their supposed reliance on certain representations made by MSSIC was not justifiable. See id. at 1188-89.

_____

[6] See Brandenburg, 859 F.2d at 1187 ("The Supreme Court has explained these injury and causation requirements as aspects of standing, rather than elements of the civil RICO plaintiff's prima facie case."), citing Sedima, 473 U.S. at 496-97.

9

When we decided in Brandenburg to impose a reliance requirement in the civil RICO context, we were fully aware that no analogous rule existed in criminal RICO prosecutions involving mail fraud. Id. at 1188 n.10. As we made clear in Caviness v. Derand Resources Corp., 983 F.2d 1295 (4th Cir. 1993), a showing of reliance on the predicate act of fraud ensures the existence of a "direct relation between the injury asserted and the injurious conduct alleged." Id. at 1305, quoting Holmes, 503 U.S. at 268; see also Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc., 18 F.3d 260, 264 (4th Cir.) (remanding for, inter alia, resolution of reliance issue), cert. denied, 115 S. Ct. 323 (1994).[7]

The appellants here contend that our pleading requirement is too rigid, contrary both to Congress's intent that RICO be liberally construed, see Pub. L. No. 91-452, 84 Stat. 947 (1970), and the Supreme Court's admonition that strict requirements of standing or proximate cause not be erected as obstacles to private RICO litigants. See Sedima, 473 U.S. at 498-99. The appellants insist that § 1964(c)'s "by reason of" language contemplates that a civil RICO suit may be maintained, not only in mail fraud cases where the deceitful mailing is the blade rushing down toward the guillotine victim, but also in cases involving more grandiose schemes to cheat, where the mailing is but part of the frame that holds the blade.

We have never held otherwise. Inasmuch as an injury may have more than one proximate cause, our rule that reliance be shown in civil RICO fraud actions does not also dictate that the fraud be the sole legal cause of the plaintiff's injury, so long as it is a legal cause. The only caveat is that, where fraud is alleged as a proximate cause of the injury, the fraud must be a "classic" one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation.

_____

[7] Even were we to question the wisdom of the reliance requirement -- as the appellants urge -- we are bound to apply circuit precedent until it is either overruled en banc or superseded by a decision of the Supreme Court. Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1990).

D.

The complaint filed in this matter adequately alleges injury. The appellants allege that their vehicles were repossessed and "sold" at a price substantially below market value. The vehicles were later resold legitimately, but the appellants were never informed of those transactions. Hence, not only were excess funds generated by the "sale" of the collateral illegally withheld, but the appellants also ostensibly remained obligated to pay phantom deficiencies. Consequently, the appellants suffered injury to their property. See Complaint, ¶¶ 90, 92.

The complaint also adequately alleges proximate cause. In order for the scheme to succeed, the appellants needed to be convinced that the "private sales" referenced in the TranSouth notices were legitimate. Had an appellant's suspicion been aroused, she might have inquired further or -- worse -- retained a lawyer to investigate the matter. See Complaint, ¶ 84 ("To further the scheme, Transouth issues false and deceptive notices of private sale which are intended to and which do mislead the public about their repossession and redemption rights."). Indeed, concealment of the nature of the "private sales" was the very linchpin of the scheme.

As we have noted, "the legal cause determination is properly one for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." Brandenburg, 859 F.2d at 1189 (citation omitted). If we accept, as we must for now, the appellants' allegation that TranSouth acted in concert with Falk's and JB in a unified scheme, it is readily apparent that all of the Brandenburg factors militate strongly in favor of holding TranSouth responsible for its actions.[8]

It is equally obvious, though, that the appellants have failed to allege that they actually relied on the TranSouth mailings to inform them of their rights and to assure them that these rights were being protected. Inasmuch as the appellants did not specifically plead reli-

_____

[8] We therefore reject the district court's alternative holding that the facts alleged in the complaint failed to show that TranSouth's mailings proximately caused the appellants' injuries. See 851 F. Supp. at 746.

11

ance, we can hardly fault the district court for faithfully applying our precedents and dismissing the complaint.

III.

We see no reason, however, to deprive the appellants of the opportunity to amend their complaint, if they can, to allege reliance. No discovery has yet been conducted, and the complaint has not previously been substantively amended, at least as far as TranSouth is concerned.**9** Although TranSouth has filed its answer, the rules provide that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); see Medigen of Ky., Inc. v. Public Serv. Comm'n of W. Va., 985 F.2d 164, 167-68 (4th Cir. 1993) ("Although the decision whether to grant leave rests within the sound discretion of the district court, . . . the federal rules strongly favor granting leave to amend.") (citation omitted).

Here, the district court apparently believed that the appellants were incapable of pleading reliance on TranSouth's notice mailings; thus, granting them leave to amend would be a fruitless act. See New Beckley Mining Corp. v. United Mine Workers of America , 18 F.3d 1161, 1164 (4th Cir. 1994) ("A court may refuse to allow leave to amend pleadings when the proposed changes would be futile.") (citation omitted). The magistrate judge's report, appended to the district court's opinion, makes the point:

> [The] plaintiffs' argument concedes that they would not have redeemed the cars even if they had known that the process was a sham and concedes further that the plaintiffs cannot make such an allegation. In short, plaintiffs did not, and can not, allege that they acted in reliance on the TranSouth mailings.

851 F. Supp. at 757 (citation to record omitted).

_____

**9** Two amendments of the complaint have been allowed, but only for the purpose of effectuating the settlement agreement negotiated with Falk's and JB.

12

In our view, the magistrate judge's conclusion misconstrues the role of the notice letter in the overall scheme. If the appellants' theory of the case prove to be true, TranSouth did not mail the notices to prevent the defaulting borrowers from exercising their redemption rights, but only to assure them that the liquidation of the collateral was proceeding legally and legitimately, thus influencing them to accept the process without question, and depriving them of a meritorious defense to JB's deficiency suit. As the magistrate judge noted in the very next sentence of his opinion:

> Plaintiffs' "reliance" argument amounts to no more than a general complaint that TranSouth participated in a massive fraud, an illegal and profitable scam, that took advantage of the innocent plaintiffs' reliance on the apparent legitimacy and legality of the operation.

Id. (emphasis supplied). We could scarcely say it more clearly. The only difficulty with the appellants' approach so far is that they have argued reliance without first pleading it. We therefore vacate the district court's judgment of dismissal and remand the case with instructions for it to give the appellants an opportunity to correct this defect.

VACATED AND REMANDED WITH INSTRUCTIONS

13