**SYSTEM MANAGEMENT, INC., Forget Me Not Services, Inc., Jose R. Cruz, Victor Laboy, Juan Ayala and Juan Ortega, Plaintiffs,**

v.

**Kenneth LOISELLE, Defendant.**

**No. Civ.A. 99–10744–WGY.**

United States District Court, D. Massachusetts.

Aug. 25, 2000.

Gabriel O. Dumont, Jr., Law Offices of Gabriel Dumont, Boston, MA, for plaintiffs.

Patricia A. Sullivan, Armando E. Batastini, Edwards & Angell, LLP, Providence, RI, for defendants.

*MEMORANDUM*

WILLIAM G. YOUNG, Chief Judge.

## I. INTRODUCTION

The factual background of this case was outlined by this Court in *System Management, Inc. v. Loiselle*, 91 F.Supp.2d 401 (D.Mass.2000). In that Memorandum and Order, this Court addressed the question of whether, in an action brought under the civil remedies provision of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) and 1962(c), a plaintiff must establish actual detrimental reliance in order to sustain a cause of action where the alleged predicate act under RICO is mail fraud, 18 U.S.C. § 1341. This Court recognized that there is a dispute among the courts as to whether a plaintiff must allege that it relied, to its detriment, on the allegedly fraudulent statements. Such reliance typically is found in common-law fraud actions, but is not required as an element of the statutory crime of mail fraud, 18 U.S.C. § 1341. In denying the defendant's motion to dismiss on this ground, this Court ruled that actual detrimental reliance is not a requirement of a mail fraud claim used as a predicate act under a civil RICO action. *See System Management*, 91 F.Supp.2d at 419.

The defendant Kenneth Loiselle ("Loiselle") subsequently brought a motion for summary judgment as against defendant Jose Cruz ("Cruz"). In that motion, Loiselle asked this Court to revisit its conclusions regarding the reliance element, particularly in light of a new Supreme Court case bearing on the issue. After further consideration, this Court DENIED summary judgment, DENIED reconsideration of that denial (Docket No. 159) and then, at the close of the plaintiffs' case, DENIED a finding for Loiselle despite a complete absence of proof of any reliance, thus continuing to adhere to the view that such proof is unnecessary. This memorandum sets out this Court's further analysis of the narrow issue.

## II. ANALYSIS

In the interest of completeness, this Court will repeat its initial analysis found in the Memorandum and Order of March 9, 2000.

In a civil RICO action with a predicate act of mail fraud, there is a dispute among the courts as to whether a plaintiff must allege that it relied on the allegedly fraudulent statements to its detriment. In the instant case, the alleged fraudulent state-

ments were made only to the Massachusetts Bay Community College (the "College"), not to any of the plaintiffs. The majority of jurisdictions would hold that such a claim would fail for lack of alleged detrimental reliance, but there are reasons to hold otherwise. The issue has been characterized accurately by Judge Wolf in a recent decision, *Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 81–83 (D.Mass.1998):

> Defendants contend ... that in the context of mail and wire fraud, a plaintiff must allege and prove actual, detrimental reliance in order to state a civil RICO claim. Neither the United States Supreme Court nor the First Circuit has rendered a decision on this precise issue. The question, then, is whether the proximate causation prerequisite requires actual, detrimental reliance in the context of RICO predicate acts of mail and wire fraud.
>
> Several courts have addressed this question, and the majority have agreed with the defendants' position. *See, e.g., Chisolm v. TranSouth Financial Corp.*, 95 F.3d 331, 337 (4th Cir.1996); *Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2nd Cir.1990); *Brandenburg v. Seidel*, 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); *Blount Financial Services, Inc. v. Walter E. Heller and Co.*, 819 F.2d 151, 152 (6th Cir.1987); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 170 (S.D.N.Y.1995). In *Brandenburg*, for example, the Fourth Circuit began its mail and wire fraud analysis with the proposition that a causal nexus is required to state a RICO claim, and ended with the conclusion that "detrimental reliance by the victim ... is necessary to establish injury to business or property 'by reason' of a predicate act of mail fraud within the meaning of § 1964(c)." 859 F.2d at 1188 n. 10. The Fourth Circuit, therefore, interpreted proximate causation in the

mail and wire fraud context to require the plaintiff to demonstrate detrimental reliance. In another civil RICO case predicated on mail fraud, the Eleventh Circuit held that the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. *Pelletier*, 921 F.2d at 1499. The *Pelletier* court also made this statement while interpreting proximate cause principles. In addition, one district court in this circuit has broached this issue, holding that reliance must be pled. *General Electric Co. v. Lyon*, 894 F.Supp. 544, 554 (D.Mass.1995) (Ponsor, J.) (citing *Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 4 [1st Cir.1984] ).

Other courts, however, explicitly reject the need for the civil RICO plaintiff to allege detrimental reliance on the mailed representations. *See Tabas v. Tabas*, 47 F.3d 1280, 1294 n. 18 (3d Cir.1995) (stating that "[d]efendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established is inaccurate"); *Akin v. Q–L Investments, Inc.*, 959 F.2d 521, 533 (5th Cir.1992) ("Plaintiffs' problems of proof with respect to securities fraud do not necessarily haunt their claim of mail fraud [as a RICO predicate act] since reliance is not an element of mail fraud."); *Abell*, 858 F.2d at 1129–30 (upholding RICO claim based on mail fraud without requiring proof of reliance); *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 481–82 (5th Cir.1986) (same).

This court finds that the line of cases that decline to read into RICO mail fraud cases a requirement of actual, detrimental reliance are most faithful to the statute and, in any event, most persuasive. Those courts imposing a reliance requirement were apparently influenced by their view of the nature of common law fraud, and were proceeding to read the requirements of common law fraud into the mail fraud statute. *See Pru-*

*dential Ins. Co. of America v. United States Gypsum Co.*, 828 F.Supp. 287, 294 (D.N.J.1993) (citation omitted). . . .

Under the mail fraud statute, however, reliance is not an element of the offense. . . . In contrast to common law fraud, the statute creates no requirement of detrimental reliance. *See, e.g., Harkness v. Fitzgerald*, 701 A.2d 370, 372 (Me.1997); *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982). As the First Circuit has recognized, the aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result. *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir.1991) ("It is not necessary to establish that the intended victim was actually defrauded.") (citations omitted). Recognizing that the mail fraud statute does not expressly require actual reliance, some courts find a reliance requirement in the "by reason of" language of the RICO statute. *See* 18 U.S.C. § 1964(c). The "by reason of" language in RICO, however, is to be interpreted in keeping with general tort principles of proximate causation. *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311, 117 L.Ed.2d 532. An examination of *Holmes*, the policies underlying RICO, and the fraudulent nature of mail fraud indicate that a reliance requirement should not be read into RICO.

This Court found Judge Wolf's reasoning compelling, and agreed with it, realizing that it weighed against the majority of jurisdictions. This Court was also aware that this conclusion ran counter to its own suggestion (albeit dicta) in a footnote in *Swartz v. Schering–Plough Corp.*, 53 F.Supp.2d 95, 106 n. 11 (D.Mass.1999):

Swartz would lack standing to sue for computer or mail fraud because there is no showing that he relied on such statements in any way. *Cf. General Elec. Co. v. Lyon*, 894 F.Supp. 544, 554 (D.Mass. 1995) (Ponsor, J.) ("To sustain a claim [for mail fraud under RICO], the injured

party must show that it relied upon the representation as true and acted on the basis of the misrepresentation to its detriment."); *but cf. Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 81–83 (D.Mass.1998) (Wolf, J.) (holding that civil RICO action premised on federal mail fraud statute requires no showing of detrimental reliance).

Having had the benefit of a more full and direct opportunity to consider the issue of reliance in a mail fraud action, this Court adopted the view that actual reliance is not a requirement of a mail fraud claim used as a predicate act under a civil RICO action.

This Court sees no reason to reconsider its decision to rely on Judge Wolf's well-reasoned conclusions, having acknowledged in its Memorandum that it was departing from the majority of Circuits that have considered this issue. Loiselle's citation to authorities in other Circuits is not persuasive, as this Court acknowledged that its decision was at odds with the majority of Courts of Appeal.

Loiselle does, however, cite a First Circuit case, *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir. 1987), for the assertion that the First Circuit would, if faced with the issue, require reliance to be shown to sustain a RICO mail fraud action. In *Pujol*, the First Circuit denied the plaintiff standing to sue under RICO for alleged mail fraud violations because the plaintiff "was not a defrauded client or investor and was not a target of any of the acts pleaded as 'predicate acts' in the RICO claim." *Id.*

A close inspection of *Pujol*, however, reveals a key distinction. The plaintiff in *Pujol* was not one of the investors who was being defrauded, but rather, "the complaint alleged that he was fired, slandered and otherwise injured because of the ac-

tions he took to report and to stop the illegal schemes." Pujol was therefore an *insider* who reported the fraud and lost his job for his honest actions. That is far removed from the situation of the individual plaintiffs [1] here, persons whom Loiselle allegedly knowingly and intentionally victimized by devising and implementing a scheme under which they would be underpaid. Along with the College, the individual plaintiffs were, therefore, the intended victim of the mail fraud scheme, although not the recipients of the mail furthering that scheme. In contrast, Pujol was not an intended victim of a scheme, but got involved of his own volition to try to stop the fraudulent activities. The First Circuit's decision in the *Pujol* case therefore *does not* suggest that it would require actual reliance on fraudulent mailings in order to allow the direct and intended victim of mail fraud to proceed with a RICO claim. This Court remains persuaded that the point is not settled in the First Circuit and that Judge Wolf's analysis is preferable despite its conflict with the majority of Courts of Appeal that have addressed the question.

Loiselle filed a Second Motion for Reconsideration in which he cites additional First Circuit cases to support his position. Those precedents are also unpersuasive. In *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir. 1990), the First Circuit concluded that the deceptive submission of a phoney contract to the Air Traffic Conference and the International Air Transport Association in order to obtain approval from those regulatory associations "may have been part of a general .plan having as its object the transfer of Norton's business to Heritage, leaving McEvoy bereft of its major client. But securing the regulatory associations' approval by devious means ... did not

---

1. Only the individual plaintiffs remain relevant to this analysis because, once the plaintiffs had rested their case and pursuant to Fed.R.Civ.P. 52(c), this Court found that the sole remaining corporate plaintiff, System

Management, Inc., had failed to prove that its damages had been proximately caused by any fraudulent actions by Loiselle. *See* Trial Tr., June 20, 2000.

mislead, trick or deceive McEvoy so as to defraud it." *Id.* at 793. The court described a "lack of a direct relationship between the regulatory fraud and McEvoy's injury" and concluded that the deceptive conduct was "not a scheme to defraud anyone of money or property." *Id.* at 794 (quoting *United States v. Evans*, 844 F.2d 36, 39 [2d Cir.1988] ). In the instant case, the alleged deception certainly involved money, and had a direct relationship to the losses of the victim employee plaintiffs. Loiselle's alleged fraud, if proven true, turned on representations to its client that it was paying its workers a certain wage. If that statement was fraudulent when made, the losses flowed directly from the successful deception. In *McEvoy*, the losses flowed from a kickback scheme with no causal connection to the fraudulent regulatory submissions. *See id.* at 793.

Loiselle argues that *McEvoy* suggests that the deception of one party cannot constitute mail fraud actionable by a victim not the recipient of the deceptive statements. The First Circuit clarified its ruling on this point, however, in *United States v. Christopher*, 142 F.3d 46 (1st Cir.1998). Although a criminal case, *Christopher* appears to clarify the law generally, with reference to *McEvoy:*

> In the scheme urged by the *McEvoy Travel* plaintiff, the deception actually followed the loss. When we reasoned that no mail or wire fraud had occurred because "the only parties deceived—[the regulators]—were not deprived of money or property," we were simply making the point that the deception must in fact cause the loss.

*Christopher,* 142 F.3d at 53.

In rejecting the notion that *McEvoy* or any other case has established in the First Circuit a "convergence" theory of mail fraud (in which the scheme must deceive the same person whom it deprives of money or property), the court wrote:

> Turning to whether we should now adopt a convergence theory, we see little reason to do so. Nothing in the mail

and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived. The phrase "scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, is broad enough to include a wide variety of deceptions intended to deprive another of money or property.... We see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of money or property by the fraud. If, for example, the role of a government regulator is to protect the monetary interests of others, a scheme to mislead the regulator in order to get at the protected funds will affect "property rights"....

*Id.* at 54.

As noted by this Court, the purpose of the statutory requirement that a cleaning contract include a stipulation as to the prevailing wage is to protect the cleaning workers. The College, as the public facility, must ensure that the wages are paid and relies on statements made to it by the cleaning company. The College, as a public enterprise, therefore acts by legislative proxy to protect the wages of the cleaning workers who are managed by private companies, and it does so through its contractual arrangements. If, as alleged, Loiselle defrauded the College by misrepresenting that it intended to pay and was paying the required wage, the fraud meets the elements for mail fraud even though the workers were not the direct recipients of the deception.

Furthermore, this Court observes that the First Circuit followed the same analysis in the civil RICO case of *McEvoy* as it did in the criminal cases of *Christopher* and *United States v. Sawyer*, 85 F.3d 713 (1st Cir.1996). This Court is thus persuaded that the elements of both causes of action are the same and that an element of reliance would not be required by the

First Circuit in the civil RICO context, were that question before it.[2]

Finally, Loiselle filed a Supplemental Memorandum, providing this Court with the very recent Supreme Court case of *Beck v. Prupis*, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). Loiselle argues that in *Beck*, the Supreme Court held that courts interpreting civil RICO must look to analogous common law principles and held that the overt act that causes the injury must itself constitute the "act of racketeering." "Because Beck was injured by conduct in furtherance of an act of racketeering but not by the racketeering itself, his civil RICO claim was properly dismissed." Def.'s Supplemental Mem. at 2.

In *Beck*, the plaintiff Beck was the president, CEO, director and shareholder of Southeastern Insurance Group ("Southeastern"). The defendants were former senior officers and directors who engaged in acts of racketeering. They had created an enterprise which demanded fees from contractors in exchange for qualifying them for Southeastern surety bonds. *See Beck*, 529 U.S. at ——, 120 S.Ct. at 1613. During most of the time he was at Southeastern, Beck was unaware of these activities. When he became aware of them, he contacted regulators. The defendants then orchestrated a scheme to remove Beck from the company by creating a false report that he had failed to perform material duties. Beck sued the petitioners asserting, among other things, a civil cause of action under section 1964(c). Beck's theory was that his injury (his termination) was caused by an overt act in furtherance of the racketeering conspiracy. The District Court and Court of Appeals both held that Beck did not have standing to sue under RICO because the injury was not caused by an act of racketeering.

At first glance, the situation seems similar to *Pujol*. An insider discovered the racketeering, reported it, and subsequently lost his job in retaliation. The rationale, articulated in *Pujol*, is that such a plaintiff has not been injured by the conspiracy but rather by independent events tangential to the fraud itself. The result in *Beck* is therefore no surprise in the First Circuit. What is a surprise, however, is the manner by which the Supreme Court arrived at its decision.

The Supreme Court explained that in order to have standing under section 1964(c), a person must be injured by reason of a violation of section 1964(d), which makes it unlawful for a person to *conspire* to violate the provisions of RICO. The Supreme Court based its decision on the "well-established common law of civil conspiracy." *Beck*, 529 U.S. at ——, 120 S.Ct. at 1613. "As we have said, when Congress uses language with a settled meaning at common law, Congress presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Id.* The Supreme Court went on to hold that at common law a plaintiff could only bring a suit for civil conspiracy if he had been injured by an act that was itself tortious. "The principle that a civil conspiracy plaintiff must claim injury from an act of a tortious character was so widely

---

**2.** The case of *Veilleux v. National Broad. Co.*, 206 F.3d 92 (1st Cir.2000), does not alter the analysis. In *Veilleux*, the First Circuit considered the elements of misrepresentation under Maine state law. The court noted that "[i]n the absence of case law explicitly addressing causation requirements in the context of misrepresentation, we apply general tort principles consistent with the Restatement (Second) of Torts." *Id.* at 124 n. 21. The First Circuit was speaking, however, to the elements of a claim under the common law of Maine. The instant case is quite different, involving a mail fraud statute written by Congress that has its elements listed explicitly. Although reference to common law may be permitted when attempting to define an ambiguous statutory term, this Court will not add to a statute elements of analogous common law civil causes of action where Congress has chosen to omit those elements. *Veilleux* is inapposite.

accepted at the time of RICO's adoption as to be incorporated into the common understanding of 'civil conspiracy.' " *Id.* at 1615. Using that principle, the Supreme Court concluded that injury caused by an overt act that is itself not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under section 1964(c) for a violation of section 1962(d) (the conspiracy provision). *See id.* Rather, a plaintiff must allege injury from an act that is analogous to an act of a tortious character, meaning an act that is independently wrongful under RICO.

Loiselle takes the Supreme Court's reasoning and makes two arguments. First, that the courts must look to *civil* common law to give content to civil RICO. He urges this Court to reconsider its position, based on Judge Wolf's reasoning, that reliance does not exist in the mail fraud statute and therefore should not be read into it.

True, Judge Wolf's reasoning discounts the notion that the common law should be read into the elements of a RICO claim, a position seemingly at odds with *Beck.* Although Loiselle's argument is therefore stronger by virtue of *Beck,* there remains one important distinction: In *Beck,* the Supreme Court was interpreting the word "conspiracy" *within the RICO statute* in an attempt to define which acts would be covered by that "borrowed" word. *See Beck,* 529 U.S. at ——, 120 S.Ct. at 1613. In Loiselle's case, there is an *absence* of a requirement of detrimental reliance in the mail fraud statute. Some courts seem to read it in, as a requirement, by citing the "by reason of" language in RICO. This is, however, not a situation in which Congress borrowed the word "reliance" (or "conspiracy") in the statute and then left it up to the common law to define what that word meant. Rather, this is a situation in which Congress has entirely omitted an element from a cause of action that one would ordinarily expect to find in the statute if Congress had so intended. Congress did not include a reliance element in the mail fraud statute. As Judge Wolf pointed out, that could reflect its desire to punish the mail fraud scheme rather than to address individual victims. *See Sebago,* 18 F.Supp.2d at 82–83. Whatever the case, Congress omitted the element of reliance in its creation of the mail fraud provisions. It is not the role of this Court to read that element back into the statute just because the Supreme Court has recently found it useful to defer to common law when interpreting a word contained in a statute. Loiselle's supplemental argument, though a valiant effort, does not carry the day.

Loiselle's second argument based on *Beck* is that the individual plaintiffs claim injury by a violation of the prevailing wage statute, Mass.Gen.Laws ch. 149, §§ 26–27H (1995), which is not an overt act constituting racketeering as that term is defined by RICO. *See* Def. Supplemental Mem. at 2. Loiselle has failed to follow this Court's admittedly intricate logic. The individual plaintiffs were allegedly injured by a scheme in which ongoing representations were made to the College that they were being paid the statutory amount. It is, in actual fact, irrelevant to their cause of action that there is a Massachusetts statutory wage law for public contracts. The real alleged fraud here is that Loiselle promised and represented to the College that it was paying its workers a *particular* agreed-upon wage. That wage was set by statute, but no matter—it could as easily have been set by the College and would have the same legal effect here with respect to fraud. The individual plaintiffs were the intended beneficiary of that high wage. The College, as the client, was functionally their guardian, securing a contractual promise that they would be paid at a certain rate. It assumed such a position because it complied with the Massachusetts wage laws. The College accepted the promise that wages would be paid at the statutory rate in exchange for its own contractual promise of payment. Loiselle's promise was allegedly broken by

each invoice he caused to be sent through the mail, which at various times attested to compliance with his promise. The overt "act of racketeering" was each submission of fraudulent invoices that represented that the individual plaintiffs were being paid the agreed-upon amount. The College thus never knew that the individual plaintiffs were being injured by being underpaid. The individual plaintiffs did not know either, being uneducated in the law and having received what they thought was in any case a good wage (though, by law and by contract, not good enough). Thus the alleged overt act of lying to the College had the direct effect of allowing Loiselle to continue to underpay his company's employees. Had that alleged overt act of lying not occurred, the College would have had the option to void the contract, as it was required to do under state law. The only victims in this scenario are therefore workers like the individual plaintiffs (and other contractors who are unable to underbid the unlawfully low expenses of Loiselle's operation).[3] As direct victims, these individual plaintiffs were injured by the alleged overt acts of racketeering even though they were not privy to the underlying contract that governed their wages. It is thus irrelevant that failure to pay the prevailing wage is not an overt act constituting racketeering as that term is defined by RICO. The real focus is on the fraudulent acts conveyed by means of the mails. Loiselle's repeated motions based on his lack of reliance argument were therefore DENIED.